

FILED & ENTERED
APR 05 2013
CLERK U.S. BANKRUPTCY COURT
Central District of California
BY gae DEPUTY CLERK

UNITED STATES BANKRUPTCY COURT

CENTRAL DISTRICT OF CALIFORNIA

LOS ANGELES DIVISION

| | |
|---|---|
| In re:<br><br>GSM WIRELESS, INC., a California corporation,<br><br>Debtor. | Case No. 2:12-bk-16456 RK<br><br>Chapter 11<br><br>Adv. No. 2:12-ap-01350 RK |
| GSM WIRELESS, INC.,<br><br>Plaintiff,<br><br>vs.<br><br>MOHAMMAD HONARKAR,<br><br>Defendant. | MEMORANDUM DECISION ON TRUSTEE'S ADVERSARY COMPLAINTS AGAINST DEFENDANTS MOHAMMAD HONARKAR AND JOSEPH FERNANDEZ DE CASTRO AND ON DEFENDANTS' CROSS-CLAIMS FOR INDEMNITY AND CONTRIBUTION |
| GSM WIRELESS, INC.,<br><br>Plaintiff,<br><br>vs.<br><br>JOSEPH FERNANDEZ DE CASTRO, an individual, and DOES 1 THROUGH 10<br><br>Defendants. | |
| MOHAMMAD HONARKAR,<br><br>Cross-Complainant,<br><br>vs. | |

JOSEPH FERNANDEZ DE CASTRO, an individual, and DOES 1 through 20,

Cross-Defendants.

**PROCEDURAL HISTORY**

On October 21, 2005, the Official Committee of Creditors Holding Unsecured Claims of GSM Wireless, Inc. ("the Committee") commenced Adversary Proceeding No. 8:05-ap-01530 JR by filing a complaint against Defendant Mohammad Honarkar ("Honarkar"). Later, GSM Wireless, Inc. ("GSM"), the Debtor, as successor-in-interest to the Committee, became the lead plaintiff in the adversary proceeding, and Steven Speier, the appointed Chapter 11 trustee is the representative of the GSM bankruptcy estate.

On February 22, 2008, GSM Wireless, Inc. ("GSM") by the Chapter 11 Trustee commenced Adversary Proceeding No. 8:08-ap-01042-RK by filing a complaint against Defendant Joseph Fernandez de Castro ("Fernandez de Castro"). Although the captions of the adversary proceedings list GSM as the plaintiff, the adversary proceedings are being prosecuted by the Chapter 11 Trustee ("Trustee") on behalf of the GSM bankruptcy estate. To avoid any confusion between prepetition and postpetition activities in this memorandum decision, the court refers to GSM as the prepetition debtor and to Trustee as the party litigating the adversary proceedings on behalf of the bankruptcy estate.

On June 17, 2010, the court issued an order which consolidated for trial purposes *GSM Wireless, Inc. v. Joseph Fernandez de Castro,* Adversary Proceeding Case No: 8:08-ap-01042 with *The Official Committee Of Creditors et al v. Honarkar*, Adversary Proceeding Case No: 8:05-ap-01530-RK, such that the earlier-filed action, 8:05-ap-01530-RK became the lead case.[1] The court will note because of the multiple case numbers, the pleadings and orders as well as transcripts relevant to this memorandum

[1] The case was subsequently reassigned Case No. 2:12-ap-01350-RK when the underlying bankruptcy case and the consolidated adversary proceedings were transferred to the Los Angeles Division on or about February 17, 2012.

decision are not filed under one case number, but may be filed under different case numbers depending on how the document was submitted to, and processed by, the court.

The operative pleading in this consolidated adversary action against defendant Honarker is the First Amended Complaint: (1) For Unjust Enrichment; (2) For An Accounting; (3) For Conversion; (4) For Breach of The Duty of Loyalty; (5) For Rescission Pursuant to California Corporations Code § 310; (6) For Rescission Of Loan Pursuant to California Corporations Code § 315; (7) For Breach Of Fiduciary Duty Pursuant to California Corporations Code §§ 309 and 316; (8) For Breach Of Common Law Fiduciary Duty; (9) For Aiding and Abetting Breach of Fiduciary Duty; (10) For Fraudulent Transfer under Cal. Civ. Code § 3439.04(a)(1) and 11 U.S.C. §§ 544 and 550 (11) For Fraudulent Transfer under Cal. Civ. Code § 3439.04(a)(2) and 11 U.S.C. §§ 544 and 550; (12) To Avoid Preferential Transfers; (13) To Recover Post-Petition Transfers; (14) to Recover Avoided Transfers for the Benefit of the Estate pursuant to 11 U.S.C. § 551; (15) For Turnover Of Property Of The Estate; (16) For Common Counts; (17) For Declaratory Relief; (18) For Objections to Claims ("First Amended Complaint against Honarker"). GSM's Notice of Motion and Motion for Leave to File First Amended Complaint. Etc., filed on February 6, 2009; Order re: GSM's Motion for Leave to File First Amended Complaint, entered on May 8, 2009. Honarker filed and served an answer to GSM's first amended complaint on March 31, 2009 and a third-party complaint for indemnity against Fernandez de Castro.

The operative pleading in this consolidated adversary action against defendant Fernandez de Castro is the Second Amended Complaint : (1) For Unjust Enrichment; (2) For an Accounting; (3) For Conversion; (4) For Breach of the Legal Duty of Loyalty; (5) To Avoid and Recover Intentional Fraudulent Transfers Pursuant to 11 U.S.C. § 544, California Civil Code § 3439 *et seq*., and 11 U.S.C. § 550; (6) To Avoid and Recover Constructive Fraudulent Transfers Pursuant to 11 U.S.C. § 544, California Civil Code § 3439 *et seq*., and 11 U.S.C. § 550; (7) To Preserve Avoidable Transfers for the Benefit of

the Estate pursuant to 11 U.S.C. § 551; (8) For Breach of Fiduciary Duty; (9) For Rescission Pursuant to California Corporations Code § 310 and/or Common Law; (10) For Aiding and Abetting Breach of Fiduciary Duty; and (11) For Common Counts ("Second Amended Complaint against Fernandez de Castro"). GSM's Motion for Leave to File Second Amended Complaint, etc., filed on October 30, 2008, as modified by GSM's Notice of Refiling Second Amended Complaint, filed on May 7, 2010; Notice of Ruling, filed on November 6, 2008. On February 25, 2009, Fernandez de Castro filed and served an answer to the second amended complaint as well as a counterclaim and cross-claim against GSM and a third-party complaint against Honarkar.

The claims in the complaints against Honarkar and Fernandez de Castro are substantially similar, if not identical.

The trial in this consolidated adversary proceeding was conducted before the undersigned United States Bankruptcy Judge on April 22, 2010, April 28, 2010, April 29, 2010, June 28, 2010, and August 2, 2010.

John C. O'Malley and Lisa A. Wegner, of the law firm of Eagan O'Malley & Avenatti, LLP, appeared as special litigation counsel for the GSM bankruptcy estate and Trustee. H. Daniel Fuller and Gabriel K. Coy of the law firm of Cadden & Fuller, LLP, appeared for Defendant Honarkar. Stephen Abraham, of the Law Offices of Stephen Abraham, appeared for Defendant Fernandez de Castro.

On August 2, 2010, after closing arguments, the court took this matter under submission. Having considered the testimony of the witnesses and the other evidence admitted at trial and the oral and written arguments of the parties, the court hereby issues this memorandum decision setting forth its findings of fact and conclusions of law.

## FACTS

The parties were not able to agree on most of the facts in this consolidated adversary proceeding as reflected in the joint pretrial order, which necessitated the trial of this matter. The few facts, three in number, that the parties were able to agree upon in the joint pretrial order were: (1) GSM was formed in or about 1998 by Defendants

Honarkar and Fernandez de Castro, *Joint Pretrial Order*, filed on June 9, 2010, Fact No. 1; (2) Honarkar and Fernandez de Castro each owned 50% of the 100,000 issued shares of stock in GSM, *Joint Pretrial Order*, Fact No. 2; and (3) Fernandez de Castro was GSM's President prior to his departure. *Joint Pretrial Order*, Fact No. 3. The remaining list of 114 factual allegations and of 100 disputed legal conclusions submitted by the parties to be resolved at trial were set out in the Joint Pretrial Order. *Joint Pretrial Order,* Facts Not Admitted by One or More Parties and Are Subject to Proof, Nos. 4-102, and Disputed Issues of Fact, Nos. 103-117, and Conclusions of Law (Claims and Defenses) Remaining to be Litigated, Nos. 118-217.

Based on the evidence received at trial, the court makes the following findings of fact.

GSM was initially an authorized agent of Pacific Bell Wireless selling wireless services, mobile phones and accessories on behalf of Pacific Bell. *Direct Examination Testimony of Defendant Mohammad Honarkar Submitted Pursuant to Declaration by Defendant Mohammad Honarkar ("Honarkar Direct Examination Declaration"),* filed on April 2, 2010, at 2:8-11, 17. Honarkar and Fernandez de Castro started GSM in 1998 with two stores, one of which was run from the back of Honarkar's retail clothing business at the time. *Id.* at 2:8-10; *Joint Pretrial Order,* Fact No. 1. GSM was incorporated as a California corporation on March 11, 1998. *Trial Exhibit B, Articles of Incorporation of GSM Wireless, Inc.; see also, Trial Exhibit D, By-Laws and Related Corporate Documents of GSM Wireless, Inc.*[2] After a series of mergers and deals in the wireless telephone industry, GSM eventually became an exclusive authorized agent of Cingular Wireless II, LLC ("Cingular"). *Honarkar Direct Examination Declaration* at 2:17-19. By 2002, GSM (with its Spanish language subsidiary, Enlace Wireless) had rapidly grown to be one of Cingular's top agents with more than 150 locations (stores and kiosks) in the following markets: San Diego, Las Vegas, Arizona, Los Angeles, Orange County, the

[2] Defendants' trial exhibits are identified by letters. Plaintiff's trial exhibits are identified by numbers.

Inland Empire, Bakersfield, Northern California, and the Pacific Northwest. *Id.* at 2:19-23. During this period of expansion of GSM, Fernandez de Castro and Honarkar split the various management duties. *Id.* at 2:24-26; *Transcript of Deposition of Joseph Fernandez de Castro (Fernandez de Castro Deposition),* October 20, 2005, at 24:8-11. Honarkar was GSM's Chief Executive Officer ("CEO") and Secretary. *Id.* Fernandez de Castro was the President of GSM. *Joint Pretrial Order,* Fact No. 3; *Honarkar Direct Examination Declaration* at 2:24-26; *Fernandez de Castro Deposition* at 15:17-25. Honarkar and Fernandez de Castro were GSM's only two directors. *Id.* According to Honarkar, he focused on negotiations with Cingular, and Fernandez de Castro focused on the sales side of the business. *Id.* at 2:26-3:1; *Fernandez de Castro Deposition* at 15:8-16, 24:18-26:2.

The relationship between GSM and Cingular was governed by the Exclusive Agency Agreements ("Agency Agreements"), which were executed by and between GSM and Cingular for each market in which GSM operated. *Honarkar Direct Examination Declaration* at 3:3-16; *see also, Trial Exhibit E, Amended and Restated Authorized Agency Agreement between Cingular Wireless and GSM Wireless, Effective February 22, 2002 ("Amended Agency Agreement, February 22, 2002); Trial Exhibit L, Exclusive Authorized Agency Agreement between Southwestern Bell Mobile Systems, LLC, d/b/a Cingular Wireless and GSM Wireless, Effective March 1, 2003 (Amended Agency Agreement, March 1, 2003)*. Generally, the Agency Agreements, though individualized for particular markets, were uniform in their contents. *Id.; see also, Honarkar Direct Examination Declaration* at 3:17-18. From time to time, GSM and Cingular also entered into various side agreements concerning specific promotions, incentives, payments, funds for stores, etc. *Honarkar Direct Examination Testimony* at 3:18-20.

Pursuant to the Agency Agreements, GSM received five basic types of compensation that were detailed in "Exhibit C Compensation Exclusive Agent" to the Agency Agreements. *Honarkar Direct Examination Declaration* at 3:21-25; *Exhibit C Compensation Exclusive Agent attached to Trial Exhibit E, Amended Agency Agreement,*

*February 22, 2002; Exhibit C Compensation Exclusive Agent attached to Trial Exhibit L, Amended Agency Agreement, March 1, 2003*. Specifically, GSM received (1) post-paid activation commissions; (2) upgrade commissions; (3) optional features commissions; (4) cooperative advertising reimbursement compensation ("Co-op Reimbursement"); and (5) residual payments in the form of activation and upgrade residuals. *Id.; see also, Honarkar Direct Examination Declaration* at 3:22-25. In addition, GSM could also be compensated for store build-out costs through Market Development Funds ("MDF") and through specific incentives and programs detailed in side letters that were generally known as SPIFFs. *Id.; see also, Honarkar Direct Examination Declaration* at 3:25-27; *Honarkar Trial Testimony,* April 28, 2010, at 10:54-10:56 a.m.

The post-paid activation commissions were one time commissions paid by Cingular to GSM for subscribers who activated cellular phone service with Cingular in a given month through GSM, but were payable only for subscribers who continued service with Cingular for a 180-day consecutive period. *Honarkar Direct Examination Declaration* at 4:1-6; *see also, Trial Exhibit E, Amended Agency Agreement, February 22, 2002* at 9-12, § 8 (Prices and Compensation) and *Exhibit C Compensation Exclusive Agent attached thereto; Trial Exhibit L, Amended Agency Agreement, March 1, 2003,* § 8 (Compensation) and *Exhibit C Compensation Exclusive Agent attached thereto*. Cingular could "charge-back" GSM for commissions paid to GSM if a subscriber discontinued service within this 180-day period. *Honarkar Direct Examination Declaration* at 4:6-8. These chargebacks became a point of serious contention between GSM and Cingular according to Honarkar. *Id.* at 4:9-10.

Cingular, pursuant to vendor agreements with GSM, paid GSM monthly Subscriber Management Fees ("SMF", and also referred to as "Residuals"), which essentially were paid in connection with customers GSM had signed up for Cingular cellular products and services. *Honarkar Direct Examination Declaration* at 4:26-5:5; *see also, Trial Exhibit E, Amended Agency Agreement, February 22, 2002* at 9-12, § 8 (Prices and Compensation) and *Exhibit C Compensation Exclusive Agent attached*

*thereto; Trial Exhibit L, Amended Agency Agreement, March 1, 2003,* § 8 (Compensation) and *Exhibit C Compensation Exclusive Agent attached thereto*. Residuals were calculated as a monthly percentage (generally 5% for GSM) of the average subscriber monthly usage based on billing collected by Cingular of all activated subscribers that were originally enrolled by GSM. *Id.* Some aspects of the payment of Residuals were conditional. *Id.; see also, Honarkar Direct Examination Declaration* at 5:2-3. GSM had to maintain a minimum increase in activation during a given month and subscribers had to incur minimal charges. *Id.; see also, Honarkar Direct Examination Declaration* at 5:2-5. Residuals were generally payable within 45 days of the close of a monthly cycle. *Id.* Cash flow from the Residuals was a key source of income for GSM. *Fernandez de Castro Deposition* at 64:21-65:12, 78:18-20. Honarkar and Fernandez de Castro testified that the Residuals from Cingular to GSM were approximately $450,000 to $500,000 per month at the time of the transaction in March 2003. *Honarkar Direct Examination Declaration* at 7:9 -11; *Fernandez de Castro Deposition* at 78:18-20.

While GSM was compensated by Cingular, it was also financed by Cingular; GSM was reliant on Cingular for inventory and credit. *Honarkar Direct Examination Declaration* at 5:6-12. GSM was required to purchase most of its inventory from Cingular. *Id.* In order to compete with other cellular agents and in order to participate in various Cingular-run incentive programs, GSM had to sell its inventory at a substantial loss, often actually giving away the mobile phone handset with the activation of a new subscriber. *Id*.; *see also Honarkar Trial Testimony,* April 28, 2010, at 10:47-10:52 a.m. Accordingly, the cost of handsets was not recovered through the retail sales of the handsets, but rather was offset against the amount of commissions owed to GSM in a given month by Cingular. *Id*. Because it often had to sell its inventory at a loss in order to generate commissions, it was difficult for GSM to procure outside financing for that inventory. *Honarkar Direct Examination Declaration* at 5:13-14.

At the outset, GSM established an inventory line of credit with Cingular, as did all other Cingular agents. *Honarkar Direct Examination Declaration* at 5:15-24. Cingular

would extend to GSM a buying account or inventory line of credit, which fluctuated, but at its peak was more than $5,000,000 a month in order to purchase inventory (handsets) for sale. *Id.* GSM would purchase inventory from Cingular through the line of credit, which was payable in 45 days (temporarily adjusted during 2003-2004 to 55 days). *Id.* In practice, Cingular would offset GSM's commissions payable (which were paid every 40 days) for the month against the amount due under the line of credit. *Id.* Commissions usually exceeded the amount due under the line of credit, but if they were inadequate, Cingular had the right to offset against Residuals or any other amounts due and owing from Cingular to GSM. *Id.* Cingular reserved the right to terminate the equipment financing agreement and the line of credit with 10 days written notice. *Id.*

GSM was run by Honarkar and Fernandez de Castro from its formation until Fernandez de Castro left GSM in 2003. *Fernandez de Castro Deposition* at 24:8-11. Honarkar and Fernandez de Castro were each a director of GSM and, until March 6, 2003, they were the only two directors of the company. *Honarkar Direct Examination Declaration* at 2:26. Honarkar became President after Fernandez de Castro left GSM on March 6, 2003. *Honarkar Deposition* at 30:1-9.

According to GSM's federal income tax return for 2002, GSM had gross income of $42,335,881, cost of goods sold of $19,923,765, deductions of $22,655,861 and ordinary income of $756,255. *Trial Exhibit 4, GSM's December 31, 2002, IRS Form 1120S, U.S. Income Tax Return for an S Corporation.* The balance sheet for GSM in this tax return reflected that as of December 31, 2002, GSM had assets of $8,791,592, liabilities of $8,714,086 and shareholders' equity of $77,506 (capital stock of $40,000 and retained earnings of $37,506). *Id.* The tax return indicated that it was prepared by GSM's outside independent accountants, Boudreau, Rickmeyer & Chang LLP. *Id.*

In or about October or November of 2002, Honarkar and Fernandez de Castro decided to part ways. *Honarkar Direct Examination Declaration* at 5:27. According to Fernandez de Castro, he and Honarkar "could no longer work together," and Honarkar wanted to continue to expand the business and Fernandez de Castro did not approve of

Honarker's "personal morals." *Fernandez de Castro Deposition* at 32:3-16. Honarkar and Fernandez de Castro attempted to divide the company evenly and devised a plan to do so, but it required approval from Cingular, which refused to approve the split up. *Honarkar Direct Examination Declaration* at 6:5-17, 21-25; *Fernandez de Castro Deposition* at 60:24-64:20. Honarkar and Fernandez de Castro requested that Cingular purchase GSM, but Cingular refused. *Honarkar Direct Examination Declaration* at 6:26-7:3; *Fernandez de Castro Deposition* at 60:24-64:20. Honarkar and Fernandez de Castro eventually decided that GSM would redeem Fernandez de Castro's stock and essentially buy him out for $3,000,000 financed by a loan from GSM to Honarkar funded from its future residual income. *Honarkar Direct Examination Declaration* at 7:4-15, 8:1-10, 10:21-11:10; *Trial Exhibits 7-19, Transaction Documents; Trial Exhibit 31, Promissory Note; Fernandez de Castro Deposition* at 61:25-63:9. This transaction for Honarkar to buy out Fernandez de Castro's stock based on GSM's loan to Honarkar, who became GSM's sole shareholder, is referred to herein as the "Transaction." *Id.*

During the negotiation of the Transaction, on or about November 2002, Babak Samini ("Samini"), an attorney hired to represent GSM, informed Honarkar and Fernandez de Castro that he could not represent either of them in the Transaction because as GSM's counsel, he had to represent its best interests. *Honarkar Direct Examination Declaration* at 8:9-11. Samini then advised Honarkar and Fernandez de Castro to each retain their own counsel. *Honarkar Direct Examination Declaration* at 8:26; *Trial Testimony of Babak Samini,* April 28, 2010 at 1:39-1:40 p.m.; *Fernandez de Castro Trial Testimony,* April 28, 2010 at 3:05-3:06 p.m. Thereafter, Honarkar retained Hately & Hampton to represent him during the negotiations of the Transaction. *Honarkar Direct Examination Declaration* at 8:13-16; *Trial Exhibit 70 (also Trial Exhibit FF), Engagement Letter from Hateley & Hampton to Mohammad Honarkar, dated December 2, 2002; Trial Exhibit 71 (also Trial Exhibit GG), Invoice from Hateley & Hampton to Mohammad Honarkar*; *Samini Trial Testimony,* April 29, 2010 at 1:39-1:40 p.m. Initially, Fernandez de Castro retained Steven Silverstein to represent him during the negotiations

of the Transaction. *Honarkar Direct Examination Declaration* at 8:17-18; *Fernandez de Castro Trial Testimony,* April 28, 2010 at 2:53-2:54 p.m.; *Samini Trial Testimony,* April 29, 2010 at 1:39-1:40 p.m. In his capacity as counsel for GSM, Samini drafted the agreements for the Transaction between Honarkar, Fernandez de Castro and GSM. *Samini Trial Testimony,* April 29, 2010, at 1:41 p.m.

Cingular's in-house counsel, Al Jimenez, also became involved in the negotiation of the agreements for the Transaction. *Honarkar Direct Examination Declaration* at 10:1-2; *Fernandez de Castro Deposition* at 82:23-83:2. Cingular was copied on emails and facsimiles containing drafts of the agreements, and Jiminez was involved throughout the course of the negotiations of the Transaction on behalf of Cingular. *Honarkar Direct Examination Declaration*, at 9:24-10:3; *Samini Trial Testimony,* April 29, 2010, at 1:46-1:51 p.m. Cingular's in-house counsel even inserted some of its own terms in the agreements, including a revision of the technical language regarding wireless services and a non-compete clause and agreement. *Samini Trial Testimony,* at 4:18-4:26 p.m.

GSM's Chief Financial Officer, Peter Elson, was also involved in reviewing and commenting on the agreements for the Transaction on behalf of GSM. *Honarkar Direct Examination Declaration*, at 9:24-10:3,10:6-10:7. A draft of the agreements was submitted to GSM's outside independent accountant, Tony Chang, of the accountancy firm of Boudreau, Rickmeyer and Chang LLP, who suggested that the Transaction be structured as a stock purchase rather than redemption. *Honarkar Direct Examination Declaration* at 10:8-12. The structure of the Transaction was altered accordingly. *Honarkar Direct Examination Declaration* at 10:8-18; *Honarkar Trial Testimony, April 28, 2010* at 11:24 a.m.

Subsequent negotiations occurred over the next few months between Honarkar, Fernandez de Castro, Samini on behalf of GSM, and Cingular regarding the structuring of the Transaction to buy out Fernandez de Castro's stock. *Honarkar Direct Examination Declaration* at 9:1-16. During the negotiations in late December 2002 and early 2003, Honarkar ceased to employ Hately & Hampton as his counsel in the discussions and

represented himself in the continued negotiations. *Id.* at 9:19-21. Fernandez de Castro ceased to employ Silverstein as his counsel and hired Thomas Pinstone as his attorney. *Id.* at 9:17–23; *Samini Trial Testimony* April 29, 2010 at 1:34-1:39 p.m.; *Fernandez de Castro Trial Testimony* April 28, 2010 at 2:53-2:54 p.m.

The parties, Honarkar, Fernandez de Castro and GSM, eventually agreed to the basic terms of the Transaction under which Fernandez de Castro would transfer his interest in GSM to Honarkar in return for $3,000,000 (the "Transfer"). *Honarkar Direct Examination Declaration* at 10:21-23; *Fernandez de Castro Deposition* at 60:24-64:20. The Transfer would include not only Fernandez de Castro's interest in GSM, but also his interests in related companies, Brookline Aliso Viejo, LLC, a holding company that owned the building in which GSM's headquarters was housed, and Global Mobile, a company that technically owned Enlace Wireless. *Honarkar Direct Examination Declaration* at 10:23-27. The $3,000,000 would be paid to Fernandez de Castro by GSM on behalf of Honarkar in 12 monthly installments of $250,000 each, which represented roughly half of the Residuals that GSM was receiving at the time for one year. *Id.* at 10:21-11:10. At Fernandez de Castro's request, Cingular agreed to pay him directly each month from the Residuals due to GSM. *Id.* at 10:22-11:4; *Fernandez de Castro Trial Testimony,* April 28, 2010, at 3:04 p.m.

On or about February 28, 2003, Honarkar, Fernandez de Castro, GSM and Cingular executed a series of agreements that comprised the Transaction. *Honarkar Direct Examination Declaration* at 12:3-6; *Samini Trial Testimony,* April 29, 2010 at 1:45-1:46 p.m.

The following documents memorialized the Transaction:

(a) Stock Purchase Agreement dated February 28, 2003. This agreement was executed by Honarkar and Fernandez de Castro. GSM was not a party to or signatory of this agreement. Section 1.2 of the Stock Purchase Agreement sets forth a purchase price of $1,000,000 for Fernandez de Castro's 50,000 shares in GSM

Wireless, Inc. Sections 5.1 and 5.2 of the Stock Purchase Agreement contain mutual releases between Honarkar and Fernandez de Castro of all liability for any claims, demands, judgments, liabilities, obligations and causes of action existing as of February 28, 2003. Section 6.2 sets forth that the delivery, by Cingular, of a fully executed Notice of Irrevocable Assignment and Acceptance was a condition to the closing of the Transaction. *Trial Exhibit 7.*

(b) Copy of Stock Assignment Separate from Certificate, executed by Fernandez de Castro as of February 28, 2003. *Trial Exhibit 8.*

(c) Purchase Agreement – Limited Liability Company Interest (Global Mobile – LLC / Honarkar) executed February 28, 2003, by and between Honarkar and Fernandez de Castro. This agreement encompasses the purchase and sale of Enlace Wireless. The purchase price of Fernandez de Castro's 49% interest in Global Mobile pursuant to Section 2.1 of this agreement is $2,000,000. Sections 7.1 and 7.2 of the agreement contain mutual releases between Honarkar and Fernandez de Castro of all liability for any and all claims, demands, judgments, liabilities, obligations, and causes of action existing as of February 28, 2003. Section 4.2 sets forth that the delivery, by Cingular, of a fully executed Notice of Irrevocable Assignment and Acceptance was a condition to closing of the Transaction. *Trial Exhibit 9.*

(d) Purchase Agreement – Limited Liability Company Interest (Global 2 – LLC / GSM Wireless, Inc.) executed as of February 28, 2003 by and between GSM and Fernandez de Castro whereby Fernandez de Castro transferred one percent of his fifty percent interest in Global Mobile to GSM for $20,000. *Trial Exhibit 10.*

(e)   First Amendment to Operating Agreement of Global Mobile, LLC, a
      Purchase Agreement – Limited Liability Company Interest (Global
      Mobile LLC/Honarkar) executed on February 28, 2003 by and
      between Honarkar, Fernandez de Castro and GSM. *Trial Exhibit 11.*

(f)   Purchase Agreement – Limited Liability Company Interest (Brookline
      Aliso Viejo, LLC / Honarkar) executed on February 28, 2003, by and
      between Honarkar and Fernandez de Castro.  This agreement
      concerned the company that owned the building in which GSM's
      headquarters was located.  The purchase price of Fernandez de
      Castro's 49% interest in Brookline Aliso Viejo pursuant to Section 2.1
      of this agreement was $49,500. *Trial Exhibit 12.*

(g)   Purchased Agreement – Limited Liability Company Interest
      (Brookline Aliso Viejo, LLC / GSM Wireless, Inc.) executed on
      February 28, 2003, by and between Fernandez de Castro and
      GSM.  This agreement concerned the company that owned the
      building in which GSM's headquarters was located.  The purchase
      price of Fernandez de Castro's 1% interest in Brookline Aliso Viejo
      pursuant to Section 2.1 of this agreement was $500. *Trial Exhibit 13.*

(h)   First Amendment to Operating Agreement of Brookline Aliso Viejo,
      LLC, executed as of February 28, 2003, by and between Honarkar,
      Fernandez de Castro, and GSM. *Trial Exhibit 14.*

(i)   Noncompetition and Nondisclosure Agreement, executed as of
      February 28, 2003, by and between Fernandez de Castro on the one
      hand and GSM, Global Mobile, LLC, Enlace Wireless, LLC,
      Brookline Aliso Viejo, LLC and Honarkar on the other hand. *Trial
      Exhibit 15.*

(j)   Resignation Letter of Joseph Fernandez de Castro, addressed to
      Honarkar of GSM and executed on March 6, 2003, by Fernandez de

Castro. In it Fernandez de Castro resigned all employment including any position as an officer, director, shareholder, manager, member, employee or otherwise with GSM. *Trial Exhibit 16*.

(k) Notice of Irrevocable Assignment and Acceptance. This Agreement was entered into as of March 1, 2003, by and among GSM, Fernandez de Castro, Honarkar, Pouran Honarkar (Honarkar's wife) and Cingular. The Notice of Irrevocable Assignment and Acceptance contains the following provisions, among others: It states in Recital A that "As a condition to this Agreement, GSM and Cingular are entering into five new, exclusive agency agreements (the 'New Agency Agreements') which shall supercede [sic] the respective Existing Agency Agreements."

It further states in Recital A, "As a condition subsequent to this Agreement Mohammad and Pouran [Honarkar] shall execute not later than March 7, 2003: (i) a Personal Guarantee in favor of Cingular guarantying the performance of GSM under the New Agency Agreement ('Honarkar/Cingular Personal Guarantee'), (ii) a Security and Pledge Agreement securing Mohammad and Pouran's obligations under the Honarkar/Cingular Personal Guarantee (the 'Security and Pledge Agreement'), and in the sole and absolute discretion of Cingular, Mohammad and/or Pouran will execute from time to time promptly upon request of Cingular, deeds of trust with assignments of rents and/or mortgages pursuant to which Mohammad and/or Pouran will grant liens on certain real property in favor of Cingular to further secure Mohammad and Pouran's obligations under the Honarkar/Cingular Personal Guaranty. As an additional condition subsequent to this Agreement, Mohammad and Pouran will execute or cause to be executed such additional

agreements and documents as Cingular shall deem necessary or

advisable to perfect its security interest in all collateral securing

Mohammad's and Pouran's obligations under the Honarkar/Cingular

Personal Guaranty."

It further states in Recital B, "Joseph and Mohammad are the

sole shareholders of GSM and related entities.  Concurrently

herewith Joseph and Mohammad are entering into certain stock

purchase agreements, dated even herewith (the 'Stock Purchase

Agreements') pursuant to which Mohammad is purchasing all of the

shares of GSM stock owned by Joseph, thereby leaving Mohammad

as the sole shareholder of GSM for an amount in excess of three

million dollars ($3,000,000)('Aggregate Purchase Price')."

It states in Recital C, "Under the New Agency Agreements,

Cingular will pay GSM certain monthly Subscriber Management Fees

('Residuals').  Pursuant to the Stock Purchase Agreements, the

Aggregate Purchase Price is to be paid in installments and it is

contemplated that GSM will instruct Cingular for itself and on behalf

of Mohammad to pay a portion of the Residuals to Joseph, which

payments will be applied to the Aggregate Purchase Price."

It states in Section 1, "GSM and Mohammad hereby give Cingular

notice that on behalf of GSM they have assigned to Joseph two

hundred and fifty thousand dollars ($250,000) of the monthly

Residuals to be applied to the Aggregate Purchase Price (hereinafter

the 'Residual Assignment') and hereby irrevocably authorize and

instruct Cingular to honor the Residual Assignment and to pay

[Fernandez de Castro] of the monthly Residuals due and payable to

GSM the first two hundred and fifty thousand dollars ($250,000) of

such monthly Residuals pursuant to the new Agency Agreements

until such time as the amount of the Residuals paid to Joseph by Cingular pursuant thereto equals Three Million Dollars ($3,000,000). For the avoidance of doubt, nothing in this Agreement shall be construed to mean that Cingular is obligated to pay to Joseph the full two hundred and fifty thousand dollars ($250,000) for any particular month, if the amount of Residuals otherwise due and payable that month would be less than two hundred and fifty thousand dollars ($250,000)."

It further contains additional extensive non-competition requirements for Fernandez de Castro to follow in consideration of the benefits he received under the Stock Purchase Agreements and the Notice of Irrevocable Assignment and Acceptance.

It further states in Section 10, "This Agreement constitutes the entire agreement and understanding among the parties hereto with respect to the subject matter hereof and supercedes [sic] any prior agreement or understanding among the parties hereto with respect to the subject matter hereof, all of which are merged herein."

It further contains provisions in Section 11 that in the event of a dispute arising from this Agreement, "Each party shall bear its own attorneys fees and costs of suit and arbitration." *Trial Exhibit 17.*

(l) Security and Pledge Agreement, executed as of March 6, 2003, by and between Honarkar and his wife Pouran Honarkar, on the one hand, and Cingular on the other hand. *Trial Exhibit 18;* and

(m) Unconditional Guarantee of Mohammad Honarkar and Pouran Honarkar, executed as of March 6, 2003, by Honarkar and Pouran Honarkar in favor of Cingular under which Honarkar and Pouran Honarkar jointly and severally, absolutely and unconditionally, guaranteed prompt payment and performance when due of any and

all existing and future obligations, covenants and liabilities of GSM to

Cingular under the New Agency Agreements and as relates to the

Obligations to Fernandez de Castro that is the subject of the New

Agency Agreements.  *Trial Exhibit 19.*

*Trial Exhibits* 7-19; *Honarkar Trial Testimony,* April 22, 2010 at 121:5-122:1; *Fernandez de Castro Deposition* at 124:2-131:25; *Trial Exhibit* 75, *Honarkar's Answer to First Amended Complaint and Third Party Cross-Complaint,* ¶¶ 17-18.

At some time after the closing of the Transaction, Honarkar executed a Promissory Note dated March 1, 2003 by Honarkar in favor of GSM in the principal amount of $3,000,000 to bear interest at 5.0% per annum, which "shall be due and payable by the undersigned as and when the undersigned receives any dividends paid by GSM in connection with the common stock of GSM owned by the undersigned."  *Honarkar Direct Examination Declaration* at 16:12-15; *Trial Exhibit 31 (also Trial Exhibit KK), Promissory Note, dated March 1, 2003.*

At or about this time Honarkar also executed five new exclusive agency agreements with Cingular on behalf of GSM.  *Honarkar Direct Examination Declaration* at 16:16-18; *Trial Exhibit L, Amended Agency Agreement, March 1, 2003.*  According to Honarkar, these new agency agreements made GSM more marketable because they solidified GSM's relationship with Cingular for several more years.  *Id.; see also, Honarkar Direct Examination Declaration* at 16:28-17:2; *Honarkar Trial Testimony,* April 28, 2010 at 11:16-11:17 a.m.

The Transaction was separated into several individual transactions involving various entities, Honarkar, Fernandez de Castro, GSM, and Cingular, a structure that came to be as the result of advice of accountants and attorneys.  *Honarkar Trial Testimony,* April 22, 2010 at 4:26 p.m. and April 28, 2010 at 10:45-10:46 a.m.; *Fernandez de Castro Deposition* at 124:2-131:25.

GSM filed a short-year federal income tax return for the period ending March 31, 2003. *Trial Exhibit 5, GSM's March 31, 2003, IRS Form 1120S, U.S. Income Tax Return*

*for an S Corporation.* According to GSM's federal income tax return for the short year ending March 31, 2003, GSM had gross income of $15,130,831, cost of goods sold of $8,883,241, deductions of $6,780,122 and ordinary income of -$532,377. *Id.* The balance sheet for GSM in this tax return reflected that as of March 31, 2003, GSM had assets of $8,242,768, liabilities of $6,137,418 and shareholders' equity of $2,105,350 (capital stock of $40,000 and retained earnings of $2,065,350). *Id.* The tax return also contained a section which reconciled income (loss) per books with income (loss) per return, Schedule M-1, which reflected deferred revenue of $2,825,107. *Id.* The tax return also contained another section for analysis of accumulated adjustments account, Schedule M-2, which reflected a balance of -$729,775 at the end of the short tax year. *Id.* The tax return indicated that it was prepared by GSM's outside independent accountants, Boudreau & Chang LLP. *Id.*

As of March 31, 2003, approximately one month after the close of the Transaction, the sum of GSM's assets exceeded its liabilities. *Direct Examination Testimony of Rebuttal Expert Philip Lieberman Submitted Pursuant to Declaration* at 5:10-14 and *Rebuttal to Expert Report of John P. Schafer,* Exhibit 1 attached thereto; *Defendant's Trial Exhibit A, Defendant Mohammad Honarkar's Disclosure of Rebuttal Expert Witness Information; see also, Fernandez de Castro Deposition* at 64:21-65:15, 99:10-15*.* GSM had a positive book value of $2,105,350 and the fair market value of its tangible assets exceeded its liabilities by $972,920. *Id.*

Fernandez de Castro began receiving his buyout payments from GSM's residuals in April 2003. *Honarkar Direct Examination Declaration* at 16:20-22; *Fernandez de Castro Deposition* at 71:10-12, 72:2-10. GSM paid the monthly buyout payments from its residuals to Fernandez de Castro until the last of the twelve monthly payments was made in April 2004. *Fernandez de Castro Deposition* at 71:2-7, 109:10-23, 124:18-19; *Trial Exhibits 7-19; Fernandez de Castro Trial Testimony,* April 28, 2010 at 2:09-2:16 p.m.; *Honarkar Direct Examination Declaration* at 16:20-17:10.

GSM began experiencing problems with its Spanish language market subsidiary,

Enlace Wireless. *Honarkar Direct Examination Declaration* at 17:17-18:20. In the summer of 2003, although the stores consistently lost money, Cingular refused to allow GSM to close ten poorly performing Enlace Stores. *Id.* at 17:20-27. This caused GSM to lose substantial cash flow. *Id.* Cingular also unilaterally changed the credit evaluation policy and deposit requirement for Enlace customers. *Id.* Thus, because a number of customers of Enlace stores were opening their wireless accounts with little or no credit, a number of those accounts would close for nonpayment soon after being opened. *Id.* As GSM generally supplied the customer with a telephone handset for little or no cost to these customers, the customers often kept the handset even though he or she failed to pay for the service afterwards. *Id.* To stop the loss of inventory, Cingular began requiring that all Enlace customers pay a prohibitively large deposit of $500 to $750 (up from $75) before Cingular would activate service. *Id.* Often, Cingular would revise its estimate of the customer's creditworthiness after the account had been opened. *Id.* at 19:17-27. In that event, Cingular would collect a customer deposit by deducting the amount after the fact from the commission payable to the agent. *Id.* Cingular also failed to provide reports documenting and breaking out the basis for Cingular's unilateral deductions from the commissions that it paid to its agents. *Id.* at 19:27-20:2.

Additionally, Enlace was primarily a kiosk-driven enterprise. *Honarkar Direct Examination Declaration* at 18:1-5. It had very few, if any actual storefront locations. *Id.* During 2003 and 2004, Cingular began opening competing company-owned stores proximate to (sometimes across the street from) Enlace kiosks. *Id*. As a result, Enlace began losing potential customers. *Id.* In December 2003, Honarker sent a letter to Cingular detailing Enlace's business problems and requested an adjustment in the commission rate for Enlace's customers to remedy these problems. *Id.* at 18:5-7; *Trial Exhibit M, Letter from Mohammed Honarkar of Enlace/GSM to Jon Garcia of Cingular regarding Enlace's business problems.* Enlace lost approximately $1.2 million in revenue between April 2003 and the summer of 2004. *Honarkar Direct Examination Declaration* at 18:11. Eventually, Enlace was forced to close its doors in all locations by October 1,

2004. *Id.* at 17:16-18:20. The financial difficulties and eventual closing of Enlace had a significant financial impact on GSM. *Id*. at 18:16-21.

Honarker testified at trial that throughout 2003 and 2004, GSM also began experiencing substantial cash flow problems because Cingular began understating the amount of the commissions for new activations and the residual commissions which it owed GSM. *Honarkar Trial Testimony,* April 28, 2010 at 11:28-11:29 a.m. As Honarker testified, for example, if a new customer to whom GSM had sold a cellular phone and a plan elected to change his telephone number before the commission was paid to the agent (because, for instance, the customer had moved to a new area and wanted a local number or simply did not like the phone number which had been assigned to him), Cingular's customer service department would give the account a new code. *Honarkar Direct Examination Declaration* at 18:27-19:4. The change would result in the commission either being paid to, and retained by Cingular, or charged back from GSM. *Id.* at 18:27-19:5. Cingular withheld or charged back GSM's commissions when customers made any number of changes to their service plans. *Id.* at 18:22-19:5. Ultimately, as Honarkar testified, Cingular's understating of GSM's commissions contributed significantly to GSM's cash flow issues. *Id.* at 21:7-8.

Honarker further testified that Cingular unilaterally changed the terms of compensation under the new Agency Agreements by amending the agreements to include a new Exhibit "C," which governed compensation of GSM as agent. *Honarkar Direct Examination Declaration* at 20:4-18. The new terms altered the conditions under which GSM received residuals and tied continued payments of residual compensation to the continued ownership of the store or kiosk from which the service originated. *Id.* Originally, GSM continued to receive Residuals or Subscriber Management Fees ("SMF") associated with a particular customer as long as that customer remained an active Cingular customer regardless of whether the location in which he or she originated service continued. *Id.* Under the new Exhibit C, however, if GSM transferred the location to another agent or it was closed or taken over by Cingular, the SMF associated with the

location ceased to be paid to GSM. *Id.* This change caused GSM to lose substantial income throughout 2004, particularly because GSM was forced to close several locations including all of its Enlace locations in 2004. *Id.*

According to Honarkar, additionally, Cingular was understating GSM's commissions for new activations and the residual commissions which it owed and paid to its agents. *Honarkar Trial Testimony,* April 28, 2010 at 11:28-11:29 a.m. The accumulated discrepancy amounts which accrued as a result of the understatements was substantial. *Id.* In one instance, pursuant to a letter agreement from Cingular to Honarkar dated March 30, 2004, Cingular paid $400,000 to GSM to cover discrepancies for the six-month period from July 2003 through January 2004. *Honarkar Direct Examination Declaration* at 20:22-24. Thereafter, Honarkar testified that Cingular complicated efforts by GSM to collect its commissions by failing to provide electronic reports documenting the basis for Cingular's unilateral deductions from the commissions that it paid to its agents and limiting access to the Teligent Activation System which had made it easy for GSM to track errors in commissions or changed orders. *Id.* at 21:1-19. According to Honarkar, GSM could no longer question the propriety of Cingular's deductions without manually auditing each month's financial reports at a significant back-office expense. *Id.* Honarkar further testified that compounding this problem, Cingular insisted that GSM provide it with manual tabulations and discrepancy reports. *Id.* at 21:4-6. Cingular could then take up to six months to respond to the discrepancy reports. *Id.*

Honarkar's testimony regarding the financial problems caused by Cingular's 2003 actions are corroborated by a January 2004 email from Peter Elson, GSM's CFO, to Honarkar, in which Elson stated, "I am very concerned that you may lose all you have built up over the past 5+ years, primarily as a result of what I see as Cingular's failure to advertise / compete adequately in the market at this time, since they have been distracted by their would-be acquisition of AT&T, which has prevented GSM from achieving the level of activations and upgrades necessary to at least break even. The position has also been significantly worsened by their reductions in commissions and

their margin on handsets that they have charged GSM." *Trial Exhibit 23, Correspondence from Peter Elson to Mohammad Honarkar.* Elson observed that Cingular had reduced GSM's commissions by approximately 20% in the fall of 2003. *Honarkar Trial Testimony,* April 28, 2010, at 11:28-11:29 a.m. Also as Elson observed, Cingular marked up the wholesale price of handsets, thereby making a profit on handsets at GSM 's expense despite GSM selling handsets for a loss. *Id.* at 11:29-11:30 a.m.

Because of these problems, GSM's cash flow issues were exacerbated and GSM found itself short of cash on hand in November of 2003. *Honarkar Direct Examination Declaration* at 21:7-8. At the same time, GSM stopped using ADP for its payroll services. *Id.* at 21:8-9. ADP had always previously automatically accounted for amounts of payroll taxes while processing GSM's payroll. *Id*. at 21:9-10. Beginning in November 2003, GSM suspended payment of its payroll taxes. *Id.* at 21:10-11. GSM continued to timely file its tax returns and acknowledge its obligation to the IRS, however it failed to pay its employment taxes from November 2003 through October 2004. *Honarkar Trial Testimony,* April 22, 2010, at 137:1-2; *Transcript of Honarkar Deposition,* December 2, 2008, at 24:15-25:20; *Honarkar Direct Examination Declaration* at 21:11-13; *Trial Exhibit 91*, ¶ 19, *Cross-Complaint filed by Mohammad Honarkar in New Cingular Wireless PCS, Inc. v. Honarkar, Superior Court of California, County of Orange, Case No. 06CC09538.* In total, GSM became delinquent in its payroll tax obligations to the IRS in the amount of approximately $3,300,000 (including penalties and interest). *Honarkar Direct Examination Declaration* at 21:13-15; *Trial Exhibit 3, Proof of Claim for Internal Revenue Taxes*.

On the proof of claim for unpaid taxes, the IRS asserted claims for unpaid income tax withholding (WT) and Federal Insurance Contributions Act (FICA) taxes for calendar quarters ending September 30, 2003 through December 31, 2004 and for Federal Unemployment Tax Act (FUTA) taxes for calendar years ending December 31, 2003 through December 31, 2005 in the total amount of $7,114,51961, including principal taxes, interest and penalties. *Id.* The first of these tax liabilities was for WT-FICA taxes

for the calendar quarter ending September 30, 2003 (covering the period of July 1 to September 30, 2003) in the amounts of $6,880.52 in tax, $5.674.88 in penalties to petition date and $864.00 in interest to petition date. *Id.* However, these amounts were relatively modest while in contrast, the IRS asserts large WT-FICA tax liabilities for the calendar quarters ending December 31, 2003 (covering the period of October 1 to December 31, 2003) in the amounts of $1,159,755.72 in tax, $338,220.16 in penalties to petition date and $74,297.58 in interest to petition date, for the calendar quarter ending March 31, 2004 (covering the period of January 1 to March 31, 2004) in the amounts of $945,492.31 in tax, $421,176.53 in penalties to petition date and $49,805.62 in interest to petition date, and for the calendar quarter ending June 30, 2004 (covering the period of April 1 to June 30, 2004) in the amounts of $908,688.13 in tax, $213,563.86 in penalties to petition date and $36,720.99 in interest to petition date. *Id.*

In early 2004, GSM's CFO, Elson, urged Honarkar that GSM should immediately request Cingular to stop paying Fernandez de Castro his $250,000 per month under the transaction, and this request was communicated to Cingular. *Honarkar Deposition, December 2, 2008* at 196:20–197:17; *Trial Exhibit 23, Correspondence from Peter Elson to Mohammad Honarkar.* Honarkar admitted that Cingular's payment of $250,000 a month of GSM's residuals directly to Fernandez de Castro instead of to GSM under the Transaction, had a detrimental impact on GSM's cash flow. *Honarkar Trial Testimony,* April 28, 2010 at 10:59 a.m. In January 2004, the idea of filing bankruptcy was discussed by Honarkar and GSM's CFO with respect to GSM. *Trial Exhibit 23, Correspondence from Peter Elson to Mohammad Honarkar.*

According to GSM's federal income tax return for 2004, GSM had gross income of $67,347,170, cost of goods sold of $31,691,849, deductions of $34,803,327 and ordinary income of $1,102,751. *Trial Exhibit 6, GSM's December 31, 2004, IRS Form 1120S, U.S. Income Tax Return for an S Corporation.* The balance sheet for GSM in this tax return reflected that as of December 31, 2004, GSM had assets of $11,980,593, liabilities of $13,098,467 and shareholders' equity of -$1,117,874 (capital stock of $40,000 and

retained earnings of -$1,157,874). *Id.* The tax return indicated that it was prepared by GSM's outside independent accountants, Boudreau & Chang LLP. *Id.*

On May 19, 2005, GSM commenced this bankruptcy case by filing a voluntary petition for relief under Chapter 11 of the Bankruptcy Code, 11 U.S.C. About this time, Honarkar invested $900,000 of his own money into GSM. *Honarkar Direct Examination Declaration* at 32:27-28. According to Honarkar, a promissory note and a security agreement were executed for the $900,000 investment in or about late May 2005. *Id.* at 33:1-3. By stipulation and order entered on August 15, 2005, the court approved Honarkar's investment as a post-petition secured loan with a reservation of rights by GSM, the official unsecured creditors' committee and any Chapter 7 or 11 trustee. *Stipulation re: Final Order on the Debtor's Emergency Motion for Order Authorizing Post-Petition Secured Loan; Order thereon,* filed on August 15, 2005.

**DISCUSSION**

In the complaints against defendants, Trustee alleges a myriad of statutory and common law claims against them with respect to the transfer of assets by the debtor, GSM, to Fernandez de Castro as a result of what the court will refer to as the Transaction, which took place in March 2003. *First Amended Complaint against Honarkar; Second Amended Complaint against Fernandez de Castro.* As described in this memorandum decision, Honarkar and Fernandez de Castro were partners in business as the two 50% shareholders of the debtor, GSM. Honarkar and Fernandez de Castro agreed that Honarkar would buy out Fernandez de Castro using assets of GSM, which would become wholly owned by Honarkar after the Transaction. The claims raised by Trustee present the question of whether Honarkar and Fernandez de Castro as the only shareholders of GSM violated any duty or obligation to the creditors of GSM, and that question in this court's view depends on whether the debtor was insolvent at the time of the Transaction or rendered insolvent by the Transaction. Defendants argue that as the sole owners of GSM, a closely held corporation, they had breached no duty or obligation to creditors because GSM was solvent at the time of the Transaction and was

not rendered insolvent by the Transaction. *See, e.g., Defendant and Cross-Complainant Mohammad Honarkar's Trial Brief,* filed on April 16, 2010, at 8-10. Trustee argues that they breached various duties as shareholders and corporate insiders of the debtor because the debtor was insolvent at the time of, or rendered insolvent by, the Transaction. *Plaintiff's Proposed Findings of Fact and Conclusions of Law,* filed on May 28, 2010, at 29. Trustee asserts various claims against defendants, but the primary claims are the fraudulent transfer claims which the court analyzes first. *First Amended Complaint against Honarkar* at 13-17, ¶¶ 59-70 (specific allegations relating to fraudulent transfer claims)*; Second Amended Complaint against Fernandez de Castro* at 8-10, ¶¶ 39-51 (same).

Trustee has alleged claims under the California Uniform Fraudulent Transfer Act ("CUFTA") against defendants Honarkar and Fernandez de Castro. California Civil Code, §§ 3439-3439.12. The authority of a bankruptcy trustee to assert a fraudulent transfer claim under the CUFTA derives from Section 544(b) of the Bankruptcy Code, 11 U.S.C. *Neilson v. Union Bank of California, N.A.*, 290 F. Supp. 2d 1101, 1144 (C.D. Cal. 2003) (citation omitted). Section 544(b) states, in relevant part, the "trustee may avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is voidable under applicable law by a creditor holding an unsecured claim . . . ." 11 U.S.C. § 544(b). Where state law provides a similar avoiding power to a creditor, as in California, Section 544(b) permits a trustee (or a debtor in possession) to stand in the shoes of the creditor and to assert the same cause of action. *Kupetz v. Wolf,* 845 F.2d 842, 845 and n. 2 (9th Cir.1988). However, under Section 544(b), a trustee may avoid a fraudulent transfer only if a creditor with a claim against the bankruptcy could have done so actually exists.

Under California law, a creditor may avoid transfers of property that are either actually or constructively fraudulent. California Civil Code, §§ 3439.04 and 3439.05. If it is shown that a transfer of property is fraudulent as to the creditors, a bankruptcy trustee may recover the transferred property, or the value of the property transferred, for the

benefit of the estate pursuant to California Civil Code § 3439.07 and 11 U.S.C. § 550.

In the amended complaints against defendants Honarkar and Fernandez de Castro, Trustee alleges that the debtor, GSM, fraudulently transferred $3 million to Fernandez de Castro in violation of California Civil Code § 3439.04(a). *First Amended Complaint against Honarkar* at 13-17, ¶¶ 59-70*; Second Amended Complaint against Fernandez de Castro* at 8-10, ¶¶ 39-51. Based on these allegations, Trustee alleges claims for actual and constructive fraudulent transfer under California Civil Code § 3439.04 and § 3439.05 against defendants Honarkar and Fernandez de Castro. *Id.*

Specifically, Trustee argues that Defendants are liable on Trustee's fraudulent transfer claims because: (1) the $3 million paid to Fernandez de Castro through the Transaction was done when GSM was insolvent or rendered GSM insolvent in 2003; (2) GSM must be presumed to have been insolvent; (3) Honarkar and Fernandez de Castro reasonably should have believed that an inability for GSM to meet its debts and obligations would result; and (4) GSM could not meet its debts and obligations as they became due. *Plaintiff's Proposed Findings of Fact and Conclusions of Law* at 29.[3] In support of these claims, Trustee makes specific factual arguments which are addressed below.

**I. Constructive Fraudulent Conveyance Under California Civil Code Sections 3439.04(a)(2) and Section 3439.05.**

Because the court is of the view that the issue of whether the Transaction prejudiced the debtor's financial condition is crucial, the court first analyzes Trustee's claims of constructive fraudulent transfer against defendants. Trustee asserts claims

[3] Defendants object to Plaintiff's Proposed Findings of Fact and Conclusions of Law on grounds that it is a post-trial legal brief rather than proposed findings of fact and conclusions of law pursuant to Fed. R. Civ. P. 52(a)(1). *Defendant and Cross-Complainant Mohammed Honarkar's Objections to the [Proposed] Findings of Fact and Conclusions of Law Submitted by Plaintiff GSM Wireless, Inc.,* filed on June 11, 2010, at 2; *Defendant Fernandez de Castro's Joinder in Part with Objections Submitted by Defendant Mohammad Honarkar,* filed on June 13, 2010, at 2. The court notes these objections of defendants, but believes that plaintiff's proposed findings of fact and conclusions of law, though not adopted by the court for the reasons stated in this memorandum decision, are helpful to the court in framing the issues presented by these adversary proceedings. In this regard, the court overrules defendants' objections on grounds that the document accurately reflects Trustee's post-trial arguments.

against defendants Honarkar and Fernandez de Castro based on constructive fraudulent transfer. Under the CUFTA, a transfer of property is constructively fraudulent as to a creditor whose claim arose before the transfer if the debtor made the transfer without receiving reasonably equivalent value in exchange for the transfer or obligation and the debtor either (a) was engaged in a business for which the remaining assets of the debtor were unreasonably small in relation to the business, (b) intended to incur, believed or reasonably should have believed that he or she would incur debts beyond his or her ability to pay as they became due or (c) the debtor was insolvent at the time or became insolvent as a result of the transfer or obligation. California Civil Code, §§ 3439.04(a)(2) and 3439.05. In other words, Trustee must prove that (1) the transfer was made without reasonably equivalent value and (2) the financial condition of debtor, considering three alternative situations: (a) insolvency at the time of the transaction or the debtor is rendered insolvent by the transaction, (b) the debtor's inability to pay debts as they became due, or (c) relatively small remaining assets of the debtor compared with the alleged fraudulent transaction. *Id.* For the reasons discussed below, the court finds that Trustee has not met his burden under any of these three alternative financial conditions. The court then finds that the Trustee has similarly not met his burden with respect to an alleged lack of reasonably equivalent value. The court also finds that Trustee has not met his burden of proving that the transfer was constructively fraudulent as to a creditor whose claim arose before the transfer.

**A. GSM Was Solvent at the Time of the Transaction and Was Not Rendered Insolvent by the Transaction.**

Trustee argues that the preponderance of the evidence establishes that GSM was insolvent at the time of the Transaction or rendered insolvent by the Transaction. *Plaintiff's Proposed Findings of Fact and Conclusions of Law* at 37:14-41:20 (Proposed Conclusions of Law, ¶¶ 24-25). The burden of proving insolvency is on the creditor asserting a fraudulent transfer claim. *See, e.g., Neumeyer v. Crown Funding Corp.,* 56 Cal.App.3d 178, 186 (1976), *disapproved of on other grounds by Liodas v. Sahadi,* 19

Cal.3d 278, 287 n. 3 (1977); *Stearns v. Los Angeles City School District,* 244 Cal.App.2d 696, 737 (1966). Thus, in this case, the burden of proving insolvency is on Trustee as the plaintiff asserting the fraudulent transfer claims. *Id.* In an action to establish a fraudulent transfer, the plaintiff must establish each requisite element by a preponderance of evidence. *Whitehouse v. Six Corp.,* 40 Cal.App.4th 527, 533-534 (1995).

CUFTA defines "insolvency" under California Civil Code § 3439.02(a) under two different tests, the "balance sheet test" and the "equity" or "cash flow test." Under the "balance sheet" method, "a debtor is insolvent if, at fair valuations, the sum of the debtor's debts is greater than all of the debtor's assets." California Civil Code, § 3439.02(a); *Bay Plastics, Inc. v. BT Commercial Corp, (In re Bay Plastics, Inc.),* 187 B.R. 315, 328 n. 22 (Bankr. C.D. Cal.1995). In determining whether a debtor's liabilities exceed the assets, the court must evaluate the debtor's assets and liabilities based upon a practical assessment of their actual value—a "fair valuation"—rather than in accordance with generally accepted accounting principles. *In re Bay Plastics, Inc.,* 187 B.R. at 330. Intangible balance sheet assets, such as goodwill, which may have no market value (either on a liquidation or going concern basis) generally should be excluded from the calculation. *Id.* at 330-331; *see also, Mellon Bank, N.A. v. Official Committee of Unsecured Creditors of R.M.L., Inc. (In re R.M.L., Inc.),* 92 F.3d 139, 156 (3rd Cir. 1996). Under the alternative "equity" or "cash flow test," California Civil Code § 3439.02(c) provides for a presumption of insolvency for "a debtor who is generally not paying his or her debts as they become due is presumed to be insolvent." *In re Bay Plastics, Inc.,* 187 B.R. at 328 n. 22.

**1. Schafer's Lack of a Balance Sheet Approach**

In support of Trustee's argument that GSM was insolvent at the time of the Transaction or rendered insolvent by the Transaction, Trustee offered the testimony and report of an expert witness, John Schaffer, who is an attorney licensed in California, founded a law firm specializing in "strategic business and transactional law" and has had

"more than a decade of professional experience providing strategic legal and restructuring advisory services." *Trial Declaration of John P. Schafer ("Schafer Trial Declaration"),* filed on March 30, 2010, at 2:4-12. In preparing his testimony, Schafer stated that he reviewed the documents relating to the Transaction and the transcripts of the depositions of Honarkar and Fernandez de Castro. *Id.* at 6-9. After reviewing these documents, Schafer "formed an opinion about the Transaction based on over a decade of experience as an insolvency attorney charged with analyzing the propriety of transactions and more recently as strategic counsel to numerous privately held businesses, which of significance in this case includes having worked full-time in-house for nine (9) months as interim general counsel for a Fortune 100 private business that was in the 'Zone of Insolvency' during the entire course of my employment, and my resulting knowledge and involvement with financially distressed corporations." *Id.* at 9:3-8. That is, Schafer "formed an opinion about Fernandez and Honarkar's conduct in this case and the voidability of the Transaction by GSM." *Id.* at 23:2-3. Schafer's ultimate opinion was:

> It is my opinion that there was no disinterested shareholder approval of the Transaction, nor was there any disinterested director approval, authorization or ratification of the Transaction. Moreover, the terms of the Transaction were neither just nor reasonable to GSM, and the Court has already found that GSM received little or no benefit from the Transaction. Finally, it is my opinion that Fernandez and Honarkar breached their fiduciary duties to GSM by consummating the Transaction to their benefit and to the detriment of the company.

*Id.* at 23:3-9.

Schafer did not expressly opine on whether the Transaction constituted a fraudulent transfer, but stated opinions regarding GSM's solvency. For instance, Schafer concluded that "GSM was basically insolvent before and after the Transaction—and could not meet its debts as they came due during the period when the funds for the Transaction were being paid" and that "GSM was insolvent at the time of the Transaction, and therefore the use of GSM's funds to purchase a shareholder's equity interest is prohibited, even if proper corporate governance practices had been observed." *Id.* at

14:9-11, 16:10-12. In support of this conclusion, according to Schafer, GSM's insolvency is based on undisputed facts:

> Because it is undisputed from the facts of this case, namely, Honarkar's admissions to Hateley, GSM's inability to meet its payroll taxes during the time period that Fernandez was receiving monthly residuals from GSM, and GSM's inability to secure a loan, among other things, that GSM was insolvent both before and after the Transaction, the directors could not have authorized a dividend, redemption or repurchase of any kind, and in fact would have faced personal liability for any such improper payment under California Corporations Code § 316 and pertinent case law. Of course, this was not how the Transaction was structured—it was structured as a use of corporate funds for personal purposes by Honarkar. Nonetheless, even a different structure would have been improper.

*Id.* at 16:14-22 and n. 39, *citing Honarkar Deposition* at 25:1-20, 122:5-113:15 [sic]; *Declaration of Donald Hateley,* ¶¶ 2-6. Schafer listed the Hateley Declaration as one of the documents he reviewed in forming his opinion. *Id.* at 5:21-26, *citing Declaration of Donald P. Hateley in Connection with GSM Wireless, Inc.'s Application for Order to Show Cause As To Why Preliminary Injunction Should Not Be Issued Freezing And/Or Preventing Impairment, Transfer, Dissipation, Or Encumbrance Of Assets Of Joseph Fernandez de Castro Pending Trial And Satisifaction Of Claims At Issue In This Litigation ("Hateley Declaration").* The Hateley Declaration was identified as Trial Exhibit 33, but never offered nor received into evidence at trial, apparently because Trustee was unable to locate and subpoena Hateley as a trial witness. *Trial Statements of John C. O'Malley,* April 28, 2010 at 4:00 p.m.

Schafer also concluded that Honarkar and Fernandez de Castro as directors and officers of GSM "owed fiduciary duties" and committed "breaches of the duty of care and duty to creditors while GSM operated in the Zone of Insolvency." *Id.* at 13:6-10, 14:14-20. In his trial declaration, Schafer explained why the "zone of insolvency" analysis is "more accurate" than a "pure" balance sheet approach:

> Having successfully assisted with the management and restructuring of several companies, both privately and publicly held, on the fringe of insolvency, I know well that determining whether a company has the ability to meet its financial obligations requires more than a simple

> assessment of the company's book value for tax purposes. One of the landmark cases discussing the "zone of insolvency," *Pereira v. Cogan,* 294 B.R. 449, 521 (S.D.N.Y. 2003), describes it as a state that may exist when "the corporation cannot generate and/or obtain enough cash to pay for its projected obligations and fund its business requirements for working capital and capital expenditures with a reasonable cushion to cover the variability of its business needs over time." The term "zone of insolvency" is used widely in bankruptcy treatises and case law and necessitates a more broad view of a company's financial condition than the straight Bankruptcy Code definition of insolvency. Based on my experience, the analysis of a company's global financial condition from a "zone of insolvency" perspective results in a much more accurate assessment of the company's ongoing viability and ability to restructure than a pure "balance sheet" approach. Based on the documentation I have reviewed in this matter, there were several red flags which led me to conclude that Honarkar and/or Fernandez knew or had reason to know that the company was in the "zone of insolvency" at the time of the Transaction was entered into, and that the value of GSM at the time of the Transaction could not be based solely on financial information prepared by accountants, which appears to be what Lieberman relied on in preparing his rebuttal report and testifying at deposition. (Lieberman Depo. 71:24-72:4.)

*Schafer Trial Declaration* at 18:9-26 and n. 40. Schafer defined the "zone of insolvency" in footnote 40 of this trial declaration: "Again, in accordance with *Pereira* and respected bankruptcy treatises such as Collier's on Bankruptcy, I define 'zone of insolvency' to be at any point when a reasonable director, based on the current financial condition of the company, knows or has reason to believe with reasonable likelihood that the company will be unlikely (a) in the near future to meet its short term financial obligations, if not already unable to do so, as well as (b) meet its long-term financial obligations." *Id.* at 18-19 n. 40.

In his trial declaration, Schafer was making opinion statements at trial on GSM's solvency at the time of the Transaction, but such statements are problematic because Schafter did not conduct any financial analysis of GSM as of the time of the Transaction to determine whether GSM was actually insolvent at that time or prior to the Transaction under a "balance sheet" analysis. *See generally, Schafer Trial Declaration.* As acknowledged by Schafer in his trial declaration, he did not review any of GSM's balance

sheets or other financial statements. *Schafer Trial Declaration* at 4-5 (listing the documents Schafer relied upon to prepare his declaration, none of which include any of GSM's financial statements). In his trial declaration, Schafer opined that the "zone of insolvency" test was a superior form of analysis for a company's financial condition. *Schafer Trial Declaration* at 18. According to Trustee, "John Schafer's testimony, determining whether a corporation is insolvent and/or operating in the 'zone of insolvency' gives due consideration to the corporation's ability to pay debts as they become due and/or the transaction itself may result in insolvency." *Plaintiff's Proposed Findings of Fact and Conclusions of Law* at 42:23-26 (Proposed Conclusions of Law, ¶ 30). According to Trustee, "[t]he term [zone of insolvency] is widely used in bankruptcy treatises and case law and necessitates a more broad view of the company's financial condition than a straight Bankruptcy Code definition of insolvency." *Id.* at 42:26-28 (Proposed Conclusions of Law, ¶ 30), *citing Schafer Trial Declaration* at 18:12-18.

Trustee's reliance on Schafer's "zone of insolvency" analysis is legally problematic because it is not the test expressly adopted in the relevant statute for determining a fraudulent transfer claim, California Civil Code, § 3439.02(a), which is the "balance sheet" test. California Civil Code § 3439.02(a); *In re Bay Plastics, Inc.,* 187 B.R. at 328; *see also, Berg & Berg Enterprises, LLC v. Boyle,* 178 Cal.App.4th 1020, 1038-1048 (2009)(holding "there is no fiduciary duty prescribed under California law that is owed to creditors by directors of a corporation solely by virtue of its operating in the 'zone' or 'vicinity of insolvency'"), *citing, North American Catholic Educational Programming Foundation, Inc. v. Gheewalla,* 930 A.2d 92, 101-103 (Del. 2007). Pursuant to California Civil Code § 3439.02(a), a review of GSM's financial statements would have been essential to a "balance sheet" analysis to determinate whether GSM's liabilities exceeded its assets. Because Schafer did not review any of GSM's financial statements and did not conduct a "balance sheet" analysis and heavily relies on a "zone of insolvency" approach specifically rejected in California (and Delaware), Schafer's opinion testimony

on GSM's solvency or lack thereof is not very helpful to the court.[4]

**2. Schafer's Equity or Cash Flow Approach**

Trustee's reliance on Schafer's "zone of insolvency" analysis apparently attempts to invoke the presumption of insolvency under California Civil Code § 3439.02(c), which provides that "a debtor who is generally not paying his or her debts as they become due is presumed to be insolvent" and is known as the "equity" or "cash flow" test. *In re Bay Plastics, Inc.,* 187 B.R. at 328 n. 22; *see also, Plaintiff's Proposed Findings of Fact and Conclusions of Law* at 32:7-10 (Proposed Conclusions of Law, ¶ 5) ("By definition, in applying the *presumption* of insolvency, the proper test and analysis of this concept is whether the company can meet its debts and obligations as the[y] mature. California Civil Code, § 3439.02(c) (a company is presumed insolvent when it cannot meet its debts and obligations as they mature.)"). Thus, in this case, Trustee does not offer evidence of a "balance sheet" analysis to ascertain GSM's solvency or insolvency, but has chosen to base his case on its ability or inability to pay its debts, arguing that "the proper tests and analyses for whether a company is rendered insolvent via a transfer under California Civil Code Sections 3439.05, 3934.04, and/or under the rules applicable to transfers to shareholders, are whether the debtor could meet its debts and obligations as they matured or came due." *Plaintiff's Proposed Findings of Fact and Conclusions of Law* at 32:11-15 (Proposed Conclusions of Law, ¶ 6), *citing, Kirkeby v. Sup. Ct. of Orange County,* 33 Cal.4th 642, 648 (2004) and California Civil Code, §§ 3439.04 and 3439.04(a)(2)(B). Trustee argues that not only the Transaction should be evaluated as a

---

[4] Additionally, Schafer's reliance upon the district court's opinion in *Pereira v. Cogan,* 294 B.R. 449, 521 (S.D.N.Y. 2003), as his primary authority for using the "zone of insolvency" test is suspect because the Second Circuit vacated the judgment entered in *Pereira v. Cogan* and remanded the case for a jury trial. *Pereira v. Farace,* 413 F.3d 330 (2nd Cir. 2005), *vacating and remanding, Pereira v. Cogan,* 294 B.R. 449 (S.D.N.Y 2003). The court also notes that the district court in *Pereira v. Cogan* was interpreting Delaware law when it set forth its "zone of insolvency" analysis, but the Delaware Supreme Court has rejected the "zone of insolvency" test to allow creditors to sue corporate directors directly for breach of fiduciary duty short of insolvency. *North American Catholic Educational Programming Foundation, Inc. v. Gheewalla,* 930 A.2d at 98-103. The "zone of insolvency" test has been rejected in California. *Berg & Berg Enterprises, LLC v. Boyle,* 178 Cal. App. 4th 1020, 1038-1048 (2009); *accord, Swimmer v. Moeller (In re Moeller),* 466 B.R. 525, 532 (Bankr. S.D. Cal. 2012).

fraudulent transfer at the time it was made, but also, each payment pursuant to the Transaction should be also evaluated as a fraudulent payment to a shareholder, such as Fernandez de Castro, as such payment was made. *Plaintiff's Proposed Findings of Fact and Conclusions of Law* at 32:15-23 (Proposed Conclusions of Law, ¶ 6), *citing Flynn v. California Casket Co.,* 105 Cal.App.2d 196, 205 (1951) and California Corporations Code, § 501.

The Ninth Circuit Bankruptcy Appellate Panel has observed that California courts have not established what constitutes sufficient evidence for a creditor to prove that a debtor was presumptively insolvent by generally not paying his debts as they became due. *Ash v. Moldo (In re Thomas),* 2006 WL 6811032 at *6 (9th Cir. BAP, unpublished memorandum opinion filed on July 25, 2006). To determine what constitutes sufficient evidence in showing that a debtor is not generally paying debts as they become due, it is appropriate for a court to look to other states that have adopted the UFTA. California Civil Code, § 3439.11 ("This chapter shall be applied and construed to effectuate its general purpose to make uniform the law with respect to the subject of this chapter among states enacting it."); *see also, Neumeyer v. Crown Funding Corp. of America,* 56 Cal.App.3d at 187. CUFTA itself refers to the test from Section 303(h)(1) of the Bankruptcy Code. *See* California Civil Code, § 3439.02, Legislative Committee Comment 3 (comparing subdivision (c) to § 303(h)(1)). The comment refers to case law under this section and implies that an inquiry under §3439.02(c) would be analogous to an inquiry under § 303(h)(1):

> In determining whether a debtor is paying its debts generally as they become due, the court should look at more than the amount and due dates of the indebtedness. The court should also take into account such factors as the number of the debtor's debts, the proportion of those debts not being paid, the duration of the nonpayment, and the existence of bona fide disputes or other special circumstances alleged to constitute an explanation for the stoppage of payments. The court's determination may be affected by a consideration of the debtor's payment practices prior to the period of alleged nonpayment and the payment practices of the trade or industry in which the debtor is engaged.

California Civil Code, § 3439.02, Legislative Committee Comment 3.[5] The court applies the "totality of the circumstances" test in deciding whether a debtor is paying his debts as they became due, which has been adopted by the Ninth Circuit. *Liberty Tool & Manufacturing v. Vortex Fishing Systems, Inc. (In re Vortex Fishing Systems, Inc.)*, 277 F.3d 1057, 1072 (9th Cir. 2002) (citations omitted). The court is to "compare the number of debts unpaid each month to those paid, the amount of the delinquency, the materiality of the non-payment, and the nature of the debtor's conduct of its financial affairs." *Id*. For the reasons discussed above and *infra*, Section I.B, the court finds that the Trustee has not shown by a preponderance of the evidence that GSM was not generally paying its debts as they became due.

**3. Problematic Expert Testimony**

Aside from his legally incorrect "zone of insolvency" opinions, Schafer also based his opinion that GSM was insolvent based on the Hateley Declaration, which is problematic because the declaration was not received into evidence. Under Federal Rule of Evidence 703, a witness qualified as an expert may base his or her opinion on "facts or data in the case that the expert has been made aware of or personally observed. If experts in the particular field would reasonably rely on those kinds of cats or data in forming an opinion on the subject, they need not be admissible for the opinion to be admitted." While an expert witness may base his or her opinion on inadmissible evidence, the court must consider whether the evidence *adequately supports* a finding

---

[5] This inquiry is in line with the case law that has developed under Section 303(h)(1) of the Bankruptcy Code, relating to involuntary bankruptcy petitions. *See Liberty Tool, & Manufacturing v. Vortex Fishing Systems, Inc., (In re Vortex Fishing Systems, Inc.),* 277 F.3d 1057, 1072 (9th Cir. 2002); *General Trading Inc. v. Yale Materials Handling Corp.,* 119 F.3d 1485, 1504 n. 41 (11th Cir. 1997); *Federal Financial Co. v. DeKaron Corp.,* 261 B.R. 61, 65 (S.D. Fla. 2001). In *Vortex Fishing Systems,* the Ninth Circuit stated that it had adopted a "totality of the circumstances" test for determining whether a debtor is generally not paying its debts under Section 303(h). *In re Vortex Fishing Systems, Inc.,* 277 F.3d at 1072, *citing, In re Bishop, Baldwin, Rewald, Dillingham & Wong, Inc.,* 779 F.2d 471, 475 (9th Cir. 1985). The Ninth Circuit concluded in *Vortex Fishing Systems* that "[a] finding that a debtor is generally not paying its debts requires a more general showing of the debtor's financial condition and debts structure than merely establishing the existence of a few unpaid debts." *In re Vortex Fishing Systems, Inc.,* 277 F.3d at 1072 (internal quotation marks omitted), *quoting, In re Dill,* 731 F.2d 629, 632 (9th Cir. 1984).

that GSM was insolvent at the time of the Transaction or was rendered insolvent by the Transaction.[6]

In the Hateley Declaration, Hateley said that, during his time as Chief Administrative Officer of GSM, he discussed the Transaction with Honarkar. *Hateley Declaration* at 2, ¶ 5. He stated:

> Honarkar admitted to [Hateley] that upon Cingular Wireless paying $250,000 a month of GSM's residuals directly to Mr. Fernandez instead of to GSM, this had an immediate detrimental impact on GSM's cash flow . . . without the $250,000 a month . . . GSM was not able to meet its operating expenses, including the timely payment of payroll taxes owed to the IRS. . . . GSM stopped making payroll tax payments to the IRS and used that money to run GSM's operations.

*Id.* at 2-3, ¶ 5. Hateley also said in his declaration that he learned that between 2002 and 2005, GSM did not pay the proper amount of taxes owed to the California State Board of Equalization. *Id.* at 3, ¶ 6.

This evidence at best provides a general description of the GSM's finances over the course of three meaningful years in the company's history, 2002 through 2005. But this evidence is too general in time to carry the Trustee's burden of proof on insolvency at the time of the Transaction. As discussed above, the Transaction occurred in March 2003. "Between 2002 and 2005" does not adequately demonstrate to this court that the debtor was insolvent at the time of—or rendered insolvent by—the Transaction in 2003.

[6] Indeed, attacks on the soundness of an expert's opinion or its credibility affect the *weight* of the opinion, rather than its admissibility. *See* Fed. R. Evid. 703; *Micrfofinancial, Inc. v. Premier Holidays Int'l, Inc*., 385 F.3d 72, 81 (1st Cir. 2004). An expert may rely on otherwise inadmissible evidence so long as such evidence is reasonably relied upon by experts in the field. *Carson Harbor Village, Ltd. v. Unocal Corp*., 270 F.3d 863, 873 (9th Cir. 2001). Schafer relied on inadmissible evidence in coming to his expert opinion that GSM was insolvent at the time of the Transaction because he relied on the Hateley Declaration, which was never received into evidence at trial, and Hateley did not himself testify at trial. This reliance is permissible so long as such evidence is a type reasonably relied upon by experts in the field (i.e., the field of determining "insolvency" for our purposes). The court finds that Schafer and other experts in his field would be reasonable in relying on the Hateley Declaration because, post-petition, Hateley acted as the Chief Administrative Officer of GSM, and communicated regularly with Honarkar regarding the debtor's financial condition and its business practices. *Hateley Declaration* at 2, ¶ 4. When forming an opinion regarding the financial stability of the debtor, it was reasonable for Schafer to consider the statements of Hateley, who was at one time GSM's Chief Operating Officer, who was knowledgeable about GSM's postpetition financial condition.

Moveover, as to the alleged admissions of Honarkar, the Hateley Declaration does not state when such admissions were made by Honarkar to Hateley, and Hateley was unavailable for cross-examination at trial to clarify this important point. Honarkar may well have made the alleged admissions long after the Transaction occurred when he became aware of the other financial problems GSM was having from its relationship with Cingular as Honarkar testified. But if Honarkar made the alleged admissions before or at the time of the Transaction in March 2003, this would have perhaps shown actual fraudulent intent, but the evidence of his making such admissions by the date of the Transaction is inconclusive.

**4. Rebuttal Testimony: Balance Sheet Approach**

Defendants offered the expert testimony of Philip Lieberman in rebuttal to the expert testimony of John Schaffer on the issues of solvency and valuation. Lieberman was qualified to testify as an expert because he is both a licensed certified public accountant and a licensed certified business appraiser. *Direct Examination Declaration of Philip Lieberman* at 2:9-15. According to Lieberman, he has been a certified public accountant for 27 years and is an Accredited Senior Appraiser designated as such by the American Society of Appraisers, who has performed appraisals of business interests for 14 years. *Id.*

Lieberman conducted a forensic accounting analysis of GSM's solvency and valuation. *Id.* at 2-9 and *Rebuttal to Expert Report of John P. Schafer*, Exhibit 1 attached thereto. In conducting his forensic analysis, Lieberman interviewed Honarkar and reviewed GSM's financial records, including among other documents, (1) GSM's federal income tax returns for the years ending December 31, 2000 through December 31, 2004; (2) Work Papers and Notes prepared internally by GSM and its accounting personnel for the years 2000 to 2004; (3) GSM's financial statements for the year ended December 31, 2002 and the accompanying Independent Accountants' Report; (4) GSM's accountants', Beaudreau and Chang's, work papers used to prepare GSM's Financial Statement for the year ending December 31, 2002. *Id.* at 3:6-4:6.

In accordance with the balance sheet analysis methodology described in *Bay Plastics,* Lieberman took the book values of GSM's assets and adjusted them to reflect fair market valuation as of the valuation date of March 31, 2003. *Id.* at 5:1-14 and *Rebuttal Report,* Exhibit 1 attached thereto at 3; *see also, In re Bay Plastics, Inc.,* 187 B.R. at 330-331. Based on his review of the tax return and discussions with GSM's officers and directors, Lieberman made downward adjustments in the book value of GSM's assets reflected on GSM's balance sheet as of March 31, 2003 to reflect actual market values which totaled $1,132,430 based on depreciated replacement cost of its fixed assets (under depreciated replacement cost, Lieberman determined that fair market value of furniture, fixtures and equipment at 65% of cost, of leased equipment at 65% of cost, vehicle at 50% of cost and leasehold improvements at 15% of cost). *Id., Rebuttal Report,* Exhibit 1 attached thereto at 3-4. The balance sheet on GSM's short year income tax return for the year ending March 31, 2003 reflected current assets of $4,689,654 (including cash, commissions receivable, inventory and intercompany and other assets), fixed assets of $3,250,035 (including furniture, fixtures and equipment, lease equipment, vehicle and leasehold improvements) and other assets of $303,079 (deposits) for a total of $8,242,768. *Id.* Based on the adjustments to the book value of fixed assets based on depreciated replacement cost to determine fair market valuation of these assets totaling $1,132,430, Lieberman determined that the adjusted value of GSM's assets as of $7,110,338. *Id.*

After subtracting GSM's liabilities of $6,137,418 as of March 31, 2003, Lieberman determined that GSM had net positive book value of its assets over liabilities of $2,105,350[7] and the fair market value of its tangible assets exceeded by liabilities by approximately $1 million (i.e., $972,920), which Lieberman testified showed that GSM was not insolvent under the balance sheet test. *Id.* at 5:8-14 and Exhibit 1 attached

---

[7] GSM's balance sheet as of March 31, 2003 reflected shareholders' equity of $2,105,350 consisting of capital stock of $40,000 and retained earnings of $2,065,350. *Trial Exhibit 5, GSM's March 31, 2003, IRS Form 1120S, U.S. Income Tax Return for an S Corporation.*

thereto. That is, Lieberman concluded that at the time of the Transaction, GSM was not insolvent according to the definitions contained in Section 101(32)(A) of the Bankruptcy Code, 11 U.S.C. ("the term *insolvent* means: (A) with reference to an entity . . . financial condition such that the sum of such entity's debts is greater than all such entity's property, at fair valuation, exclusive of . . . (i) property transferred, concealed, or removed with intent to hinder, delay or defraud such entity's creditors; and (ii) property that may be exempted from the estate under section 522 of this title") and Section 3439.02 of the California Civil Code ("a debtor is insolvent if, at fair valuations, the sum of the debtor's debts is greater than all of the debtor's assets). *Id.* at 5:1-9.

Lieberman noted that his balance sheet analysis did not take into account GSM's intangible assets, which also have value for GSM, but were not part of the balance sheet analysis. *Id.* at 5:12-6:5 and *Rebuttal Report,* Exhibit 1 attached thereto. Lieberman conducted further valuation of GSM under the "income" and "market" approaches. *Id., Rebuttal Report,* Exhibit 1 attached thereto at 5-10. Lieberman concluded that the fair market value of one hundred percent of GSM's issued and outstanding common stock as of March 31, 2003 was approximately $8,000,000 based on its capitalization rate ("cap rate") of 21.54% divided into projected net free cash flow of $1,699,200. *Id.* at 6:14-16. Lieberman determined cash flow based on pro forma revenue ($68,000,000) based on historical figures (i.e., based on first quarter 2003 of $17,000,000 annualized) and adjusted by historical cost of goods sold (45.0%) and other costs and expenses (39.0%) to determine EBITDA, and then adjusted for noncash expenses, interest and taxes (36%) to determine normalized net income ($2,099,200). *Rebuttal Report,* Exhibit 1 attached thereto at 9. Noncash expenses ($800,000) is added back to the normalized net income ($2,099,200) to determine gross cash flow ($2,899,200), and subtracting estimated annual reinvestment requirements of working capital ($400,000) and fixed assets ($800,000) to yield net free cash flow ($1,699,200). *Id.* While not offering any valuation analysis of his own, Trustee criticized Lieberman's methodology and rebuttal report as "utterly hypothetical" (see *Plaintiff's Proposed Findings of Fact and Conclusions of Law* at

43:8 (Proposed Conclusions of Law, ¶ 31), the court determines that Lieberman's analysis and opinion to be credible and reasonably consistent with GSM's historical financial data as of March 31, 2003.[8] Based on his income analysis, Lieberman opined that the $3,000,000 paid to Fernandez de Castro for his fifty percent interest in the issued and outstanding common stock of GSM at the time of the Transaction was reasonable. *Id.* at 6:16-17. The court also finds that this valuation determination is also reasonable based on Lieberman's income approach.

Lieberman relied upon GSM's short year federal income tax return for the period ending March 31, 2003 as well as the financial workpapers of GSM's independent accountant, Chang. Both sides heavily relied upon GSM's short year income tax return for the period ending March 31, 2003 for their respective positions. Based on Schafer's opinion, Trustee argued that because the return reflected a loss of $532,377 for the short year, this indicated that GSM was in the "zone of insolvency" as of that date. However, as Trustee's expert witness, Schafer acknowledged on cross-examination at trial (and as Lieberman testified at trial), GSM's federal income tax return for the short fiscal year ending March 31, 2003 showed that GSM had deferred income of $2.8 million reflected on its books and on its tax return that if it had been recognized during that quarter for income tax purposes would have shown that GSM actually had a net positive taxable income of $2,292,730 on that tax return. *Schafer Trial Testimony,* April 29, 2010 at 9:40-9:53 a.m.; *Direct Examination Declaration of Philip Lieberman* at 7:12-21; *see also Trial Exhibit 5, GSM's March 31, 2003, IRS Form 1120S, U.S. Income Tax Return for an S Corporation.* Trustee further argues that GSM would be unable to pay its debts as shown by starting off 2003 with "a balance of negative $189,000," apparently referring to the

---

[8] Trustee argues that Lieberman's testimony and analysis should be disregarded as hypothetical because as he "patently failed" to consider actual events post-dating the Transaction (*Plaintiff's Proposed Findings of Fact and Conclusions of Law* at 43:22-23 (Proposed Findings of Fact, ¶ 33)), but it seems to the court that to do as Trustee argues would have engaged in improper hindsight rather than evaluating developments that could have been reasonably foreseen at the time of the Transaction. *See, In re R.M.L., Inc.,* 92 F.3d at 155.

"Accumulated Adjustments Account" on the 2002 income tax return. *Plaintiff's Proposed Findings of Fact and Conclusions of Law* at 8:1-9:2 (Proposed Findings of Fact, ¶¶ 26 and 27, and 39:18-41:2 (Proposed Conclusions of Law, ¶ 24(6)). The court finds that this evidence is not probative because no testimony was offered to explain the relevance of the "Accumulated Adjustments Account" to GSM's solvency.

**5. GSM Not Insolvent Based on Equity or Cash Flow Approach**

Lieberman also determined that at the time of the Transaction, GSM was not in what Schafer defines as the "zone of insolvency." *Direct Examination Declaration of Philip Lieberman* at 7:23-28. Using Schafer's definition of the term, as of March 31, 2003, GSM should have been expected to meet its short-term and long-term financial obligations. *Id.* at 9:12-13. It had not suffered any real loss as of the first quarter of 2003, only a taxable loss due to deferred income unrecognized on the tax return. *Id.* at 7:15-21; *see also Trial Exhibit 5, GSM's March 31, 2003, IRS Form 1120S, U.S. Income Tax Return for an S Corporation*. Thus, according to Lieberman, GSM was profitable at the time of the Transaction. *Id.* at 7:21-21.

Finally, as defendants' rebuttal expert witness, Lieberman, testified, GSM based on its financial condition at the time of the Transaction in March 2003 would have been able to afford to make the buyout payments to Fernandez de Castro and would have remained solvent and profitable for several years. *Lieberman Trial Declaration* at 8:3-26. That is, Lieberman concluded that at the time of the Transaction, if all things had remained constant, GSM had the ability to pay Fernandez de Castro for his fifty percent interest in the issued and outstanding common stock of GSM without becoming insolvent as a result of meeting its payment obligation of $250,000 a month for twelve consecutive months. *Id.* at 8:15-17. Lieberman's testimony and analysis, which the court finds credible, show GSM would reasonably have expected a positive cash flow for the years 2003 and 2004 after making the $250,000 monthly payments to Fernandez de Castro if all things had remained constant with GSM's operations and there were no interruptions or disruptions to its business due to Cingular's policy changes. *Id.* Thus, according to

Lieberman's analysis, even though the projections show that GSM might have expected a $330,082 negative net cash flow after taking into account $1,200,000 in estimated annual reinvestment requirements, GSM would reasonably have expected a positive net cash flow by the end of 2004 in the amount of $510,000. *Id.* at 8:10-12. According to Lieberman, GSM's historical income statements reflected EBITDA (Earnings Before Interest, Taxes, Depreciation and Amortization) of $1,399,059 for calendar year 2002 based on gross commission income and sales of $43,335,881 with cost of sales of $23,773,845 and other costs and expenses of $18,182,977. *Id., Rebuttal Report,* Exhibit 1 attached thereto at 6; *see also, In re Red Mountain Machinery Co.,* 448 B.R. 1, 8 n. 14 (Bankr. D. Ariz. 2011)(explaining EBIDTA). According to Lieberman, GSM's historical income statements reflected EBITDA of $1,399,059 for the first quarter of 2003 ending March 31, 2003 based on gross commission income and sales of $17,955,938 with cost of sales of $9,899,383 and other costs and expenses of $5,804,357. *Id., Rebuttal Report,* Exhibit 1 attached thereto at 6. The evidence of positive EBITDA for 2002 and first quarter of 2003 indicates to the court that GSM was a viable going concern and does not indicate that it was in the zone of insolvency as argued by Trustee.

Lieberman's cash flow projections for 2003 and 2004 based on this historical income data for 2002 and first quarter of 2003 are reasonable based on this data known as of March 31, 2003 and show that GSM would have had the ability to make the payments from its residual income to Fernandez de Castro without running a deficit. *Id.* According to Lieberman, GSM's historical financial data showed that it had gross commission income and sales of $24,976,158 for 2001, and of $43,335,881 for 2002, reflecting an increase of 73.5 percent from 2001 to 2002. *Id.* GSM's historical financial data showed commission income and sales of $17,955,938 for the first quarter 2003, and based on the volume of sales for this quarter, Lieberman projected the same volume of sales based on the first quarter results to forecast commission and sales income for the remaining three quarters of 2003 at $50,000,000, which the court finds to be reasonable. *Id.* Based on GSM's historical financial data for 2001 to first quarter 2003, Lieberman

projected commission income and sales for GSM of $75,000,000 for 2004, roughly a 10 percent increase, which the court finds also to be reasonable. The sales growth for 2001 to the first quarter of 2003 based on GSM's actual financial data validate Lieberman's opinion that GSM as a going concern would be able to meet its payment obligations under the Transaction with sufficient cash flow.

**6. Conclusion Regarding Insolvency**

Trustee's evidence of GSM's insolvency at the time of the Transaction or by the Transaction consists of Schafer's opinion testimony and alleged admissions of Honarkar and Fernandez de Castro. The court does not give much weight to Schafer's opinion testimony because it is based on the Hateley Declaration, which is inadmissible itself and in turn is based in part on alleged admissions of Honarkar, which are taken out of context. The court finds that the alleged admissions of Honarkar and Fernandez de Castro do not establish that GSM was insolvent at the time of the Transaction and by the Transaction. Moreover, Trustee's expert, Schafer, did not conduct a balance sheet analysis, and thus, Schafer's insolvency analysis does not compare with Lieberman's as it did not comport with the statutory test for insolvency under the California Uniform Fraudulent Transfer Act in California Civil Code, § 3439.02. On the other hand, defendants' expert witness, Lieberman, has shown that GSM's assets exceeded its liabilities at the time of the Transaction, and thus for purposes of § 3439.02(a), under the balance sheet approach, it was not insolvent at the time of, or rendered by, the Transaction. Moreover, the court finds that Trustee has also failed to show by a preponderance of the evidence that GSM was unable to pay its debts as they became due to raise the presumption under California Civil Code, § 3439.02(c) that GSM was insolvent at the time of the Transaction. Thus, the court finds that Trustee has not met his burden in showing by preponderance of the evidence GSM was insolvent at the time of the Transaction, or that the Transaction rendered GSM insolvent.

**B. Trustee Has Not Established That GSM Intended or Believed it Would Incur Debts Beyond Its Ability to Pay as They Become Due**

In support of the constructive fraudulent transfer claims against defendant, Trustee argues that at the time of the Transaction in March 2003, defendants as GSM's directors "intended to incur, or believed or reasonably should have believed" that GSM would incur debts beyond its ability to pay as they became due under California Civil Code § 3439.04(a)(2)(B). *Plaintiff's Proposed Findings of Fact and Conclusions of Law* at 35:8-11 (Proposed Conclusions of Law, ¶ 16). Specifically, Trustee argues: "The pertinent facts likewise show that it was unreasonable for Honarkar and Fernandez de Castro as of March 2003-April 2004 to believe that GSM would have the ability to meet its debts and obligations when they came due, while GSM sent $3 million in cash to Fernandez de Castro and received no equivalent cash in return." *Id.* As noted by Trustee, "As to basic facts, the transfers of GSM funds to Fernandez de Castro were undertaken monthly in the amount of $250,000 from April 2003 to roughly April 2004 for the total sum of $3,000,000." *Id.* at 34:7-9 (Proposed Conclusions of Law, ¶ 11). As Trustee further contends, "By October 2003, it is irrefutable that GSM could not meet its debts and obligations as they matured/came due and ceased paying its payroll taxes and terminated its payroll service because it did not have the necessary cash to pay them." *Id.* at 34:10-12 (Proposed Conclusions of Law, ¶ 12).

Trustee argues that the liability of defendants is established by an alleged admission by Honarkar in a state court pleading that "[a]s a result of the cash flow pressures caused by the buyout of DeCastro and the need to defend and settle litigation brought in bad faith by a law firm specializing in fomenting labor disputes, GSM was unable to meet its payroll tax obligations during the fourth quarter of 2003 and the first three quarters of 2004." *Id.* at 34:15-21 (Proposed Conclusions of Law, ¶ 13), *citing Trial Exhibit 91,* ¶ *19; see also, id.* at 11:17-24 (Proposed Findings of Fact, ¶ 34). That is, "[Honarkar] thus has admitted that the transfers rendered GSM insolvent and unable to meet its debts and obligations as they came due or matured." *Id.* at 34:21-22 (Proposed

Conclusions of Law, ¶ 13); *see also, id.* at 38:14-39:17 (Proposed Conclusions of Law, ¶ 24(5)). Defendants vigorously dispute this argument, stating that Trustee's "remaining so called evidence of GSM's alleged insolvency relies exclusively on circumstantial evidence of GSM's nonpayment of its payroll taxes beginning in November 2003, over 8 months after the Transaction." *Defendant Honarkar's Objections to Trustee's Proposed Findings of Fact and Conclusions of Law* at 12:24-26 and 13:22-14:5. While perhaps supportive of the Trustee's position, this alleged admission of defendant Honarkar does not establish by a preponderance of the evidence that GSM was unable to pay its debts at the time of the Transaction because Honarkar's allegation in the later filed pleading related to GSM's ability to pay debts as of the fourth quarter of 2003 based on its payroll tax problems, which is not the relevant time. Other evidence is needed to prove Trustee's argument on this point.

Trustee argues that "[t]he remaining evidence . . . likewise shows that the inadequate financial circumstances of GSM were known when the Transaction was agreed to, and should have been reasonably anticipated by anyone examining the facts and circumstances at issue." *Plaintiff's Proposed Findings of Fact and Conclusions of Law* at 34:23-25 (Proposed Conclusions of Law, ¶ 14). The court examines the other evidence which Trustee in his proposed findings of fact and conclusions of law argues indicates that the Transaction prejudiced GSM's financial condition to establish that the Transfer was a fraudulent transfer.

Trustee contends that GSM was generally not paying its debts as they became due as shown by GSM's debts existing before and at the time of the Transactions, by its taking loans from shareholders, Honarkar and Fernandez de Castro, prior to 2002 to pay expenses and by its failure to pay its employment tax obligations in November 2003. *Id.* at 34:10-14 (Proposed Conclusions of Law, ¶ 12), at 35:3-7 (Proposed Conclusions of Law, ¶ 15), apparently citing *Id.* at 18:7-23:21 (Proposed Findings of Fact, ¶¶ 58-60) (referring to "debts and obligations as noted above in chart form"), at 37:17-24, 38:7-40:6 (Proposed Conclusions of Law, ¶¶ 24, 24(1), 24(4), 24(5) and 24(6)).

Trustee argues that GSM's bankruptcy schedules show that GSM had "repeated debts dating back to 2001 and early 2002 that were still unpaid as of the bankruptcy in 2005." *Plaintiff's Proposed Findings of Fact and Conclusions of Law* at 38:7-13 (Proposed Conclusions of Law, ¶ 24(4)). While the GSM's schedules to its bankruptcy petition indicates that GSM had debts as of the bankruptcy filing in 2005, including payroll tax debts, the debts listed on the bankruptcy schedules filed in 2005 do not necessarily show that GSM had debts or was insolvent at the time of the Transaction in March 2003. Trustee relies upon GSM's bankruptcy schedules, specifically, Schedules D and F, listing creditors holding secured claims and general unsecured claims, as showing debts of the company going back to 2001 and 2002. *Id.* at 18:17-23:21 (Proposed Conclusions of Law, ¶¶ 58-60), *citing Trial Exhibits 96 and 98, Schedule D-Creditors Holding Secured Claims and Schedule F-Creditors Holding Unsecured Non-Priority Claims.* The court does not find that the schedules are probative of GSM's debts as of the Transaction in March 2003 because there is no direct evidence of the listed claims establishing such debts as of that date, there is no evidence showing who and how the schedules were prepared, or whether Honarkar or Fernandez de Castro had any involvement in the preparation of the schedules to attribute the information in the schedules to them, and the information on the schedules do not necessary show that the listed debts were incurred by the time of the Transaction since many, if not most, of the reference dates listed for the claims are lease creation dates and not lease default dates. Trustee did not offer other evidence to show that that GSM had incurred or failed to pay the debts on the schedules as of the time of the Transaction in March 2003.

Trustee showed that GSM failed to pay its payroll tax debts, but these debts first became a problem in the fourth quarter of 2003, which was six months after the Transaction in March 2003. *Honarkar Direct Examination Declaration* at 21:11-13; *Trial Exhibit 91,* ¶ 19; *Fernandez de Castro Deposition* at 66:6-13.

Trustee did not offer other evidence to show that GSM had failed to pay any debts at the time of the Transaction in March 2003. Thus, Trustee argues not so much that

GSM was not paying its debts as they became due as of the Transaction in March 2003, but that by October 2003, it had problems paying its debts as they became due because of its obligation to pay the buyout payments to Fernandez de Castro from the Transaction along with its business expansion promoted by Honarkar and the pending labor law litigation against GSM.[9] *Plaintiff's Proposed Findings of Fact and Conclusions of Law* at 38:14-39:17 (Proposed Conclusions of Law, ¶ 24(5)). However, Trustee did not offer any evidence to show that the labor law lawsuit had any impact on GSM being unable to pay its debts as they became due as of the Transaction in March 2003.

The court finds that Trustee has not otherwise demonstrated that defendants as GSM's directors "intended to incur, or believed or reasonably believed" GSM would incur debts beyond its ability to pay as they became due at the time of the Transaction. First, Trustee argues that this is shown because prior to 2002, GSM was forced to cover its expenses by taking loans from shareholders to the business and was already delinquent on taxes. *Id.* at 37:22-24. However, while there is some evidence that defendants made loans to GSM for it to pay expenses, this does not necessarily show that GSM was incurring debts beyond its ability to pay as the debts became due. *Fernandez de Castro Deposition* at 31:25-32:2. Apparently, defendants made loans to GSM to pay expenses, and the loans were repaid, but the evidence does not show as argued by Trustee that GSM was incurring debts beyond its ability to pay.

Therefore, based on the evidence presented at trial, the court finds that Trustee

[9] In February 2003, GSM and its stockholders were named as defendants in a class action lawsuit (the "Class Action Lawsuit"). The plaintiffs in the Class Action Lawsuit asserted that GSM violated California labor laws and sought damages in excess of $1,000,000 plus interest, treble damages and attorneys' fees and expenses. GSM's April 15, 2003 Financial Statements indicate that GSM had retained legal counsel to represent it in the litigation and intended to seek an out-of-court settlement for substantially less than $1,000,000. *Trial Exhibit 57 – GSM Wireless Inc.'s Financial Statements at December 31, 2002 and for the Year then Ended and Independent Accountants' Report* at 10. The evidence before the court is inconclusive whether this lawsuit had any actual impact on GSM's solvency at the time of the Transaction since no evidence was presented as to the outcome of the lawsuit. The lawsuit was settled in 2004, but there was no evidence presented as to the nature of the claim. *Plaintiff's Proposed Findings of Fact and Conclusions of Law* at 38:14-39:17 (Proposed Conclusions of Law, ¶ 24(5)); *Defendant and Cross-Complainant Mohammad Honarkar's Objections to the [Proposed] Findings of Fact and Conclusions of Law Submitted by Plaintiff GSM Wireless, Inc.,* filed on June 11, 2010, at 13:22-27.

has not met his burden of proving by a preponderance of the evidence that GSM was not paying its debts as they became due as of the date of the Transaction in March 2003. However, the Trustee's arguments that the cumulative effect of GSM's obligations to pay Fernandez de Castro from the Transaction rendered it insolvent or left it with unreasonably small assets to operate will be discussed below.

The court finds that at no point during the negotiations of the Transaction did either Honarkar or Fernandez de Castro believe or intend to incur debts on behalf of GSM beyond its ability to pay. Relying on the advice of their financial advisors, including GSM's outside independent accountant, Chang, and after considering GSM's past performance, both defendants believed that the transaction would leave GSM financially stable and Honarker with a valuable position in GSM moving forward from the Transaction. The court also finds that Trustee's argument is rebutted by defendants' evidence of intervening events, including evidence that Cingular's new policies affecting GSM following the Transaction significantly contributed to GSM's subsequent financial problems. Defendants could not have predicted the economic downturn after the buyout, the increased competition from other Cingular stores (*Honarkar Direct Examination Declaration* at 18:1-5), higher wholesale prices on inventory (*Honarkar Trial Testimony, April 28, 2010* at 11:28-11:30 a.m.), Cingular's practice of understating GSM's share of new activation commissions and residual commissions (*Honarkar Direct Examination Declaration* at 18:22-25), Cingular's unilateral change of the credit evaluation policy and deposit requirements for Enlace customers (*Id.* at 17:20-27), Cingular's refusal to allow GSM to close the Enlace stores that were losing money (*Id.),* and the altered residual payment terms resulting in 20% less commissions (*Id.* at 20:4-18) were all significant intervening factors that drastically affected GSM's ability to meet its operating expenses. As discussed herein, defendants have shown that GSM's inability to pay its employment tax obligations was due to cash flow problems that arose after the Transaction from Cingular's policy changes. Therefore, the court finds that Trustee has failed to show by a preponderance of the evidence that GSM was not paying its debts as they became due

at the time the Transaction in March 2003 and the Transaction caused it to be unable to pay its debts as they became due.

### C. GSM's Remaining Assets Were Not Unreasonably Small in Comparison to the Transaction

California Civil Code § 3439.04(a)(2)(A) provides that a transfer may be avoided if the debtor is left with assets that are "unreasonably small in relation to the business or transaction." California Civil Code § 3439.04(a)(2)(A). "The subparagraph focuses attention on whether the amount of all the assets retained by a debtor was inadequate, i.e., unreasonably small in light of the needs of the business or transaction in which the debtor was engaged or about to engage." California Civil Code § 3439.04, Legislative Committee Comment Note 4; *Intervest Mortgage Investment Co. v. Skidmore*, 655 F. Supp. 2d 1100, 1105-1106 (E.D. Cal. 2009) (defining assets as "unreasonably small" if they are "not reasonably likely to meet the debtors' present or future needs."). Unreasonably small assets signify an inability to generate enough cash flow from operations and the sale of assets to remain financially stable. *Duke Salisbury v. Texas Commerce Bank-Houston, N.A. (In re WCC Holding Corp.)*, 171 B.R. 972, 985 (Bankr. N.D. Tex 1994).

Trustee argues that GSM had "negative retained earnings going into 2003 and significant tax losses for both years [2002 and 2003], including a loss for the first quarter of 2003 in excess of $500,000 – all before the payments to Fernandez de Castro commenced." *Plaintiff's Proposed Findings of Fact and Conclusions of Law* at 37:25-28. However, this is not what the evidence showed. According to GSM's federal income tax return for 2002, GSM had ordinary income of $756,255 and retained earnings of $37,506. *Trial Exhibit 4, GSM's December 31, 2002, IRS Form 1120S, U.S. Income Tax Return for an S Corporation.* There were no losses for 2002 or no negative retained earnings going into 2002. *Id.; see also,Trial Exhibit 57, GSM Wireless, Inc. Financial Statements at 12/31/02 and For the Year Then Ended and Independent Accountants' Report* at 3 (Balance Sheet). As acknowledged by Trustee's own expert, Schafer, and testified to by

Lieberman, GSM's short year March 31, 2003 income tax return shows deferred income that, if realized during that quarter for tax purposes, would have shown that GSM actually had a net positive income of $2,292,730. *Schafer Trial Testimony,* April 29, 2010, at 9:40-9:53 a.m.; *Direct Examination Declaration of Philip Lieberman* at 7:12-21; *see also, Trial Exhibit 5, GSM's March 31, 2003 U.S. Income Tax Return for an S Corporation* (Schedule M-1, Reconciliation of Income (Loss) per Books With Income (Loss) per Return);*Trial Exhibit 57, GSM Wireless, Inc. Financial Statements at 12/31/02 and For the Year Then Ended and Independent Accountants' Report* at 3 (Balance Sheet). The balance sheet on the short year return for March 31, 2003 indicated that positive retained earnings of $2,065,350. *Trial Exhibit 5, GSM's March 31, 2003, IRS Form 1120S, U.S. Income Tax Return for an S Corporation.*

Trustee also argues that despite GSM not having funds to cover expansion, Honarkar decided to continue the expansion of GSM. *Plaintiff's Proposed Findings of Fact and Conclusions of Law* at 38:1-6. In support of this argument, Trustee cites the *2005 Fernandez de Castro Deposition* at 31:12-15, where Fernandez de Castro responds affirmatively that, " . . .[GSM] was not able to finance both its expansion and its operations directly or only from [its own] operations . . ." The impression given by this statement from Fernandez de Castro's deposition testimony does not appear to be supported by the financial data. For example, GSM's federal income tax return for 2002, GSM reported ordinary income of $756,255 based on gross income of $42,335,881, cost of goods sold of $19,923,765 and other deductions of $22,655,861. *Trial Exhibit 4, GSM's December 31, 2002, IRS Form 1120S, U.S. Income Tax Return for an S Corporation.* That is, GSM was not losing money in 2002 as shown by its tax return.[10]

[10] Moreover, the balance sheet for GSM on this tax return reported shareholders' equity of $77,506 (capital stock of $40,000 and retained earnings of $37,506) as of December 31, 2002. *Trial Exhibit 4, GSM's December 31, 2002, IRS Form 1120S, U.S. Income Tax Return for an S Corporation.* The shareholders' equity at the end of 2002 would have been much higher if Honarkar and Fernandez de Castro had not received stockholder distributions of $978,673 during 2002. *Trial Exhibit 57, GSM Wireless, Inc., Financial Statements at December 31, 2002 and for the Year Then Ended and Independent Accountants' Report* at 4.

Honarkar also testified that throughout 1998 and 2002, Cingular gave GSM money by rapidly increasing GSM's line of credit and allowing it to open stores and expand. *Honarkar Direct Examination Declaration* at 3:8-10. However, the sole fact that Cingular increased GSM's line of credit between 1998 and 2002 does not establish that the remaining assets of GSM were unreasonably small in relation to the Transaction.

Trustee additionally argues that GSM was unable to obtain financing before or after the Transaction. *Plaintiff's Proposed Findings of Fact and Conclusions of Law* at 41:3-5. As Honarkar testified, GSM was reliant on Cingular for its inventory and credit. *Honarkar Direct Examination Declaration* at 5:6-7. The Agency Agreements between Cingular and GSM required GSM to purchase its entire inventory from Cingular. In order to compete with other cellular agents and participate in Cingular sponsored incentive programs, GSM was then forced to sell its inventory for a loss. *Id.* at 5:7-10. The cost of handsets was not recovered through retail sales, but rather was offset against the amount of commissions owed to GSM in a given month by Cingular. *Id.* 5:11-12. The nature of the Agency Agreements made it difficult for GSM to procure outside financing and ultimately made GSM dependent on Cingular for GSM's financing. GSM's difficulty obtaining outside financing was a result of the binding nature of the Agency Agreements – not a symptom of GSM's financial distress. This fact by itself does not establish that the remaining assets of GSM were unreasonably small in relation to the Transaction.

Finally, Trustee argues that GSM listed a "multi-million dollar loan" from Honarkar as an asset on its balance sheet and that this greatly skewed GSM financial soundness. *Plaintiff's Proposed Findings of Fact and Conclusions of Law* at 41:8-11. Lieberman's testimony and analysis demonstrated that at the time of the Transaction, if all things had remained constant for GSM, GSM would have been able to afford to make the payments to Fernandez de Castro and remain solvent and profitable for several years. *Direct Examination Declaration* at 7-8 and Exhibit 1 attached thereto at 5-7. Lieberman's testimony and analysis further show that as of March 31, 2003, if all things had remained constant with GSM's operations and there were no interruptions or disruptions to its

business, GSM would reasonably have expected a positive cash flow for the years ended 2003 and 2004 after making the $250,000 monthly payments to Fernandez de Castro. *Id.* Thus, even though the projections show that GSM might have expected a $330,082 negative net cash flow after taking into account $1,200,000 in estimated annual reinvestment requirements, GSM would reasonably have expected a positive net cash flow by the end of 2004 in the amount of $510,000. *Id.* This would have resulted in a $180,000 net positive cash flow for GSM over the course of the payments to Fernandez de Castro in 2003 and 2004. *Id.* Moreover, Lieberman's testimony and analysis show that even after making the payments to Fernandez de Castro in 2003 and 2004, GSM should have expected to have net tangible assets (recorded at book value) that exceeded its liabilities by approximately $2,100,000 and $3,100,000 respectively. *Id.* After conducting a forensic accounting analysis of GSM's financial records and projecting cash flows from historical financial data, Lieberman testified that at the time of the Transaction, GSM would have been able to make the payments to Fernandez de Castro and remain solvent for several years based on the financial information known as of March 31, 2003, proximate in time to the Transaction which occurred about a month before. *Id.* The court finds that Lieberman's financial analysis and cash flow projections are conservative and consistent with on GSM's historical financial data relating to revenues and expenses, and are thus reasonable. Based on this testimony and analysis, the court concludes that Trustee's argument that a loan from Honarkar skewed GSM's financial soundness lacks merit.

The court finds that Trustee has failed to meet his burden of showing that GSM was engaging in a business or a transaction for which the remaining assets of GSM were unreasonably small in relation to the Transaction. Trustee contends that because the company subsequently went bankrupt, the Transaction must have been the primary cause. However, the court finds that Trustee's argument is rebutted by Defendants' evidence of intervening events, including evidence that Cingular's new policies affecting GSM succeeding the Transaction significantly contributed to GSM's demise. Specifically,

the court notes that the increased competition from other Cingular stores (*Honarkar Direct Examination Declaration* at 18:1-5), higher wholesale prices on inventory (*Honarkar Trial Testimony, April 28, 2010* at 11:28-11:30 a.m.), Cingular's practice of understating GSM's share of new activation commissions and residual commissions (*Honarkar Direct Examination Declaration* at 18:22-25), Cingular's unilateral change of the credit evaluation policy and deposit requirements for Enlace customers (*Id.* at 17:20-27), Cingular's refusal to allow GSM to close the Enlace stores that were losing money (*Id.),* and the altered residual payment terms resulting in 20% less commissions (*Id.* at 20:4-18) were all significant intervening factors that drastically affected GSM's ability to meet its operating expenses. While the court does realize that the Transaction did have an immediate detrimental impact on GSM's business as testified, the Transaction by itself still provided GSM with enough assets and continued cash flow to continue to operate profitably as illustrated by Lieberman's testimony and financial analysis.

Therefore, because the assets of GSM were not left unreasonably small in relation to the business because of the Transfer and GSM would have been able to operate profitably as attested to by Lieberman's testimony and analysis, the court finds that the Transfer should not be recovered or avoided under California Civil Code § 3439.04(a)(2)(A).

**D. Trustee Has Established that the Transaction Was Made Without Receiving Reasonably Equivalent Value as to Honarkar, but not as to Fernandez de Castro**

Lack of reasonably equivalent value is a question of fact, and Trustee bears the burden of proof on this issue in a fraudulent transfer action. *Pajaro Dunes Rental Agency, Inc. v. Spitters* (*In re Pajaro Dunes Rental Agency, Inc.)*, 174 B.R. 557, 578 (Bankr. N.D. Cal. 1994) (citations omitted). Reasonably equivalent value is not the same as fair market value. *BFP v. Resolution Trust Corp.*, 511 U.S. 531, 536 (1994). In determining whether a transfer was for a reasonably equivalent value, the court must compare the value of the property surrendered with the value of what a debtor received in exchange for the transfer. *In re Pajaro Dunes Rental Agency, Inc.*, 174 B.R. at 578

(citations omitted). Reasonably equivalent value "is to be judged from the standpoint of the creditors of the debtor." California Civil Code § 3439.03 Legislative Committee Comment Note 2; *see also, In re Pajaro Dunes Rental Agency, Inc.*, 174 B.R. at 578 (whether debtor received reasonably equivalent consideration "is determined from the perspective of creditors of the estate").[11]

In regards to the Transaction at issue, Honarkar argues that the transfer of $3 million from GSM for him to buy Fernandez de Castro's stock was made for a reasonably equivalent value on grounds that GSM received valuable consideration from Honarkar in connection with the Transaction in the form of (1) the Promissory Note from Honarkar; (2) Honarkar Personal Guaranty and Security Pledge of all of GSM's debts and obligations to Cingular; (3) the Non-Compete Agreement from Fernandez de Castro; and (4) an extension of the Cingular Exclusive Agency Agreements for five additional years. Honarkar argues that from Fernandez de Castro, GSM received a Non-Competition Agreement (at a time when Fernandez de Castro had already taken steps to form a competing business in the markets GSM occupied).

This court finds that Trustee has shown by a preponderance of the evidence that GSM did not receive reasonably equivalent value for the $3 million paid for Honarkar to purchase the shares belonging to Fernandez de Castro at the time of the Transaction. The items described above in exchange to GSM for Honarkar's buyout of Fernandez de Castro with GSM's residual income had some value, the court concludes that it was not reasonably equivalent value. Reasonably equivalent value "is to be judged from the standpoint of the creditors of the debtor."

---

[11] From Fernandez de Castro's perspective, he gave reasonably equivalent value for his one-half interest in GSM in light of Lieberman's valuation of his interest based on the income approach. *Lieberman Trial Declaration* at 6-7 and *Rebuttal Report,* Exhibit 1 attached thereto at 9. In the court's view, Fernandez de Castro sold his GSM stock to Honarkar for reasonably equivalent value when he sold it for $3 million. In this three-cornered transaction between Honarkar, Fernandez de Castro and GSM, Fernandez de Castro gave up reasonably equivalent value for the money received in the Transaction. The lack of reasonably equivalent value occurs in the Transaction as to the loan between Honarkar and GSM since GSM, which was to be totally owned and controlled by Honarkar, financed the Transaction for Honarkar.

The court concludes that the major component of the consideration that Honarkar gave for the loan from GSM to buy out Fernandez de Castro was his promise to repay the $3 million that GSM paid on his behalf from its residual income. Honarkar's promise to repay the loan by GSM is memorialized in the "contingent" promissory note he gave to GSM, which had an important limiting condition that the loan principal and interest would only be due and payable by Honarkar only to the extent that he received dividends from GSM. *Trial Exhibit 31, Promissory Note.* This favorable condition to Honarkar's loan is because Honarkar was on both sides of the transaction as the borrower and the 100-percent owner of the lender, signing the note for both sides. Thus, if GSM turned out to be profitable in the future would he have to repay the obligation when he received his dividends from GSM, but if GSM had no profits to be able to pay dividends or could not due to insolvency in the future, then Honarkar has no obligation to repay the loan despite his getting the benefit of GSM's payment of residual income from Cingular to pay off his acquisition of Fernandez de Castro's one-half interest in GSM, and the creditors would have to absorb the loss from the loan nonrepayment. In essence, Honarker in the Transaction got a risk-free loan from GSM to buy out Fernandez de Castro's stock (in other words for Honarkar, the contingent loan was a "heads I win, tails you lose" proposition). That is, Honarkar is only obligated to pay if GSM made money and paid him dividends, but if it did not make money and did not pay dividends, then some other parties would bear the loss from the nonrepayment of the loan, most likely, GSM's creditors. Accordingly, the court concludes that reasonably equivalent value was not given by Honarkar for his benefiting from the Transaction.

Apparently, Honarkar argues that reasonably equivalent value was given because the Transaction was functionally the same as a stock redemption because while receiving Fernando de Castro's interest and becoming GSM's sole shareholder was a "nominal benefit," he testified that "GSM gained the contingent Promissory Note through which it would be reimbursed for any payments made to Mr. Fernandez de Castro through any dividends that GSM might declare to me." *Honarkar Direct Examination Declaration* at

16:20-28. The court does not find that this argument has merit because the Transaction was structured not as a stock redemption, but as a stock purchase financed with GSM's future residual income and Honarkar chose not to use GSM's current funds to pay for the stock (and he did not use his personal funds).

Honarkar could also argue that at the time of the Transaction, GSM had some ability to pay dividends as reflected in its balance sheet on its short-year March 31, 2003 income tax return showed that it had retained earnings of $2,065,350, which could have been used to pay dividends, so creditors could have had a reasonable expectation of repayment of the loan as of March 31, 2002. California Corporations Code, § 500(a) and (b)(1) and (2); *Trial Exhibit 5, GSM's March 31, 2003, IRS Form 1120S, U.S. Income Tax Return for an S Corporation.* However, the court concludes that this would not make a difference because Honarkar was getting a risk-free loan for himself from GSM and shifting the risk of loss from nonpayment to the creditors, and thus, at least as between GSM and Honarkar, the transfer of GSM's funds to Fernandez de Castro, reasonably equivalent value was not given.

Trustee argues that the court's preliminary factual finding on his motion for preliminary injunction that GSM did not benefit from the Transaction indicates the lack of reasonably equivalent value. However, the court's findings of fact made in connection with a motion for preliminary injunction is not a binding adjudication on the merits. *University of Texas v. Camenisch,* 451 U.S. 390, 395 (1981); *Hophag Research Ltd. v. Garcia,* 475 F.3d 1029, 1035 (9th Cir. 2007); 3 Schwarzer, Tashima and Wagstaffe, *California Practice Guide: Federal Civil Procedure Before Trial,* ¶ 13:179 at 13-80 (2012). However, this is a moot point because the court finds in favor of Trustee on this issue as to Honarkar, but not as to Fernandez de Castro.

**E. Trustee Has Not Established that the Transaction Was a Fraudulent Transfer as to a Creditor Whose Claim Arose Before the Transaction.**

In order for Trustee to maintain a claim for constructive fraudulent transfer, Trustee must show that there were creditors whose claims arose before the Transaction.

*California Civil Code,* §§ 3439.01(b) and (c) and 3439.05; *In re Bay Plastics, Inc.,* 187 B.R. at 331-332. As discussed above, Trustee has not shown that there was any creditor whose claim arose before the Transaction in order to assert a claim of constructive fraudulent transfer in this case (the only exception was Cingular, which consented to the Transaction). *Schafer Trial Testimony,* April 29, 2010 at 9:58-9:59 a.m.; *Honarkar Trial Testimony,* April 28, 2010 at 10:20-10:29 a.m.; *see also, Trial Exhibit 2, List of Creditors Holding 20 Largest Unsecured Claims; Trial Exhibit 96, List of Creditors Holding Secured Claims; Trial Exhibit 98, List of Creditors Holding Unsecured Non-Priority Claims.* Trustee had not laid a proper foundation for these documents to establish that there were prepetition creditor claims that arose before the Transaction on or about March 1, 2003.

Because Trustee has failed to prove by a preponderance of the evidence that (1) GSM was insolvent at the time of the Transaction or was rendered insolvent by the Transaction; (2) the Transaction left GSM unable to pay its debts as they became due; (3) the Transaction left GSM with unreasonably small assets in relation to the business; (4) GSM did not receive reasonably equivalent value from the Transaction, and (5) there were claims of creditors whose claims arose before the Transaction, Trustee has not met his burden of proving that the payments to Fernandez de Castro were “constructively” fraudulent transfers pursuant to California Civil Code, § 3439.04(a)(2) and § 3439.05.

**II. Actual Fraudulent Conveyance Under California Civil Code Section 3439.04(a)(1)**

Trustee’s claim for actual fraudulent transfer under California Civil Code § 3439.04 against defendants was brought under California Civil Code § 3439.04(a)(1), which provides:

> A transfer made or obligation incurred by the debtor is fraudulent as to a creditor, whether the creditor’s claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation as follows: (1) With the actual intent to hinder, delay, or defraud any creditor of the debtor.

Trustee as the plaintiff bears the burden of proving a claim based on actual fraudulent transfer. *Acequia, Inc. v. Clinton (In re Acequia, Inc.)*, 34 F.3d 800, 805-806

(9th Cir. 1994). However, under actual fraud, Trustee need not prove that the debtor was insolvent, rendered insolvent, or otherwise in a vulnerable financial condition. *Id.; Plotkin v. Pomona Valley Imports (In re Cohen)*, 199 B.R. 709, 716-717 (9th Cir. BAP 1996). The standard of proof for actual intent under California Civil Code § 3439.04(a) is by a preponderance of the evidence. *Decker v. Voisenat (In re Serrato)*, 214 B.R. 219, 229 (Bankr. N.D. Cal. 1997); *Whitehouse v.Six Corp.*, 40 Cal.App.4th at 533-534.

Because there is usually no direct evidence demonstrating actual intent, courts generally infer actual fraudulent intent from the circumstances surrounding the transaction. *In re Acequia, Inc.*, 34 F.3d at 805-806. Thus, "proof by a creditor of certain objective facts (for example, a transfer to a close relative, a secret transfer, a transfer of title without transfer of possession, or grossly inadequate consideration) would raise a rebuttable presumption of actual fraudulent intent." *BFP v. Resolution Trust Corp.*, 511 U.S. at 541. In a fraudulent transfer inquiry based on actual intent, the court needs to focus on the state of mind of the transferor. *In re Cohen*, 199 B.R. at 716-717.

Section 3439.04(b) sets forth a nonexclusive, eleven-factor test for determining whether a transfer was made with an actual intent to hinder, delay, or defraud a creditor. Consideration may be given, among other factors, to any or all of the following:

(1) Whether the transfer or obligation was to an insider;

(2) Whether the debtor retained possession or control of the property transferred after the transfer;

(3) Whether the transfer or obligation was disclosed or concealed;

(4) Whether before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit;

(5) Whether the transfer was of substantially all of the debtor's assets;

(6) Whether the debtor absconded;

(7) Whether the debtor removed or concealed assets;

(8) Whether the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred;

(9) Whether the debtor was insolvent or became insolvent shortly after

the transfer was made or the obligation was incurred;

(10) Whether the transfer occurred shortly before or after a substantial debt was incurred;

(11) Whether the debtor transferred the essential assets of the business to a lienholder who transferred the assets to an insider of the debtor.

California Civil Code, § 3439.04(b). In considering the indicia of a fraudulent transfer, the court "should evaluate all of the relevant circumstances involving a challenged transfer" and "may appropriately take into account all indicia negativing as well as those suggesting fraud. . . ." *Annod Corp. v. Hamilton & Samuels*, 100 Cal.App.4th 1286, 1298 (2002), *quoting,* Legislative Committee comment for California Civil Code, § 3439.04, *12A West's Ann. Civ. Code* following California Civil Code, § 3439.04 (referring to statutory language before 2004 amendment of § 3439.04).

In evaluating the factors under California Civil Code § 3439.04(b), the court determines some factors weigh in favor of Trustee and some factors weigh in favor of the defendants, but on balance, the factors weigh in favor of defendants.

In this case, Fernandez de Castro received $3,000,000 transferred by GSM to him pursuant to the Transaction in which Honarkar borrowed against the residual income of GSM, which became his wholly owned and controlled company in the Transaction, to buy out Fernandez de Castro. Thus, the court finds that the first factor of Section 3439.04(b) weighs in favor of Trustee because the transfer was made to Fernandez de Castro, an insider of GSM, the transferor, since he had been a 50% shareholder, director and president of GSM. The court determines that the transfer took place at the time of the Transaction in which the contractual obligations were incurred by the parties to the Transaction, Fernandez de Castro, Honarkar and GSM. The court analyzes the Transaction as consisting of two components: (1) the sale and purchase of GSM stock transferring it from Fernandez de Castro to Honarkar; and (2) the loan by Honarkar from GSM causing the transfer of funds to pay Fernandez de Castro, and these parties were

contractually committed to the Transaction. Therefore, the court does not agree with Trustee's argument that the transfer should be considered when the monthly installment payments of $250,000 were actually made from its residual income to Fernandez de Castro.

The second factor does not weigh in favor of Trustee because GSM, the debtor/transferor, did not retain possession or control of the transferred property, the $3,000,000, after the transfer to Fernandez de Castro. This is not a situation where the transferor engages in a sham transfer to retain the right to exercise dominion and control over the ostensibly transferred property. The money actually went to Fernandez de Castro, the transferee.

The third factor is not present because the transfer was disclosed and not conceals as the transfer was the culmination of a multi-party, multi-round series of negotiations in which the debtor/transferor, GSM, its insiders, Honarkar and Fernandez de Castro, and its primary business partner, Cingular, were actively involved in the negotiations, were represented by counsel and other professionals and the transfer was part of an extensively negotiated and documented transaction.

Fourth, regarding pending litigation, although GSM, the debtor/transferor, was sued in a labor law action in 2003, this factor does not weigh because the transfer was not intended to defeat such litigation, but to transfer control of GSM in one of the founding shareholders. The litigation was not a motivating factor for the transfer here alleged to be fraudulent. Moreover, Trustee did not offer sufficient evidence that this litigation had a significant adverse impact on GSM's financial condition.

The fifth factor does not weigh in favor of Trustee because the transfer did not involve substantially all of debtor/transferor GSM's assets. Rather, the transfer involved payment by Cingular of GSM's monthly residual income of $250,000 to Fernandez de Castro for a limited period of 12 months. As shown by Lieberman's analysis and report, GSM had other assets besides the residual income.

The sixth factor does not weigh in favor of Trustee because there is no evidence

that the debtor/transferor, GSM, absconded. To the extent that Honarkar is deemed the debtor/transferor, there is no evidence that he absconded.

The seventh factor does not weigh in favor of Trustee because there is no evidence that the debtor/transferor, GSM, removed or concealed assets. To the extent that Honarkar is deemed the debtor/transferor, there is no evidence that he removed or concealed assets.

The eighth factor weighs in favor of Trustee because, while the debtor/transferor, GSM, received several forms of consideration in exchange for the $3,000,000, including (i) the Promissory Note from Honarkar; (ii) the Guarantee and Security Pledge Agreement from Honarkar; (iii) the Non-Compete Agreement from Fernandez de Castro; and (iv) five new Agency Agreements consolidating terms for each market and extending the exclusive relationship between GSM and Cingular for several more years, the primary consideration for the loan was Honarkar's commitment to repay the loan to GSM. The terms of the loan had a huge contingency, that is, Honarkar was not obliged to repay the loan unless GSM paid him dividends, so if GSM became unable to pay him dividends, Honarkar had no obligation to repay the loan, even though he got the loan and any benefit from it. Thus, the Transaction as between Honarkar and GSM, namely, the loan by GSM to Honarkar, the consideration given by Honarkar was not reasonably equivalent value to the transfer for the reasons discussed previously. However, the Transaction as between Fernandez de Castro and Honarkar, namely, the purchase and sale of Fernandez de Castro's stock in GSM, Fernandez de Castro gave reasonably equivalent value for the transfer of his stock to Honarkar for the reasons discussed previously.

The ninth factor does not weigh in favor of Trustee, as discussed herein, the debtor/transferor, GSM, was not insolvent at the time of the Transaction and did not become insolvent as a result of the Transaction discussed previously.

Tenth, the Transfer did not occur shortly before GSM incurred substantial debt.

Eleventh, the essential assets of the business, GSM, were not transferred to a lienholder who then transferred the assets to an insider of the debtor.

As such, only several of the eleven Section 3439.04(b) factors weigh in favor of an "actual" fraudulent conveyance. In evaluating the totality of the circumstances, the court finds that Trustee has failed to prove by a preponderance of the evidence a claim under California Civil Code § 3439.04(a)(1) to recover a fraudulent transfer with actual intent to hinder, delay or defraud any creditor by the debtor.

In the Transaction, one founding shareholder of GSM (Honarkar) bought out the other founding shareholder (Fernandez de Castro) based on an agreed price, which represented the value of the 50 percent interest of the business, and unless the debtor/transferor was insolvent or rendered insolvent, the business was 100 percent owned by the remaining shareholder, who could use company assets totally owned by him to pay for his buyout of the other shareholder. The shareholders had irreconcilable differences on how the company was to be run and decided to part ways. The evidence indicates that Honarkar bought out Fernandez de Castro because Honarkar thought GSM had value as a going concern and would be profitable. As discussed previously, the evidence indicates that GSM was not insolvent at the time of the Transaction transferring the funds to Fernandez de Castro, that GSM was not rendered insolvent by the Transaction at the time it was made and that the parties to the Transaction did not contemplate that GSM would not have the ability to engage in the Transaction by lending the funds to Honarkar. As discussed previously, post-Transaction events primarily from difficulties in the relationship between GSM and Cingular, particularly over the Enlace kiosk stores, led to the subsequent financial problems that GSM had in late 2003 and afterwards.

Given the dislike of Honarkar and Fernandez de Castro for each other at the time of the Transaction, it is highly unlikely that Honarkar would effectively cash out Fernandez de Castro for a large sum of money if Honarkar thought the business would fail soon. If Honarkar knew that the business was going to fail, the last thing he would intend is give a large sum of money to his estranged business partner, Fernandez de Castro, and leave himself with exposure to personal liability to creditors for the debts of a

business that failed. Accordingly, the court finds Honarkar's trial testimony that he did not actually intend the Transaction to be a fraudulent transfer because he expected that GSM would be profitable and he wanted to keep the business for himself to be credible.

For the foregoing reasons, the court finds that the Transaction was not a fraudulent transfer of GSM's assets to Fernandez de Castro with actual fraudulent intent and denies the intentional fraudulent transfer claims.

**III. GSM's Claim to Avoid and Recover Preferential and Post-Petition Transfers**

Trustee alleged claims in the amended complaints against Honarkar and Fernandez de Castro to avoid and recover preferential or post-petition assets from the Transaction. However, Trustee did not present any evidence or argument regarding these claims at trial. That is, no evidence was presented to show that payments pursuant to the Transaction were made by GSM to Fernandez de Castro after the bankruptcy petition was filed in October 2005 or within the one-year preference period for insiders under 11 U.S.C. § 547. Accordingly, the court concludes that these claims should be denied as abandoned.

**IV. Rescission Under Corporations Code Section 310**

Trustee asserts claims for rescission of the Transaction pursuant to California Corporations Code, § 310(a), arguing that the Transaction was not just or reasonable to GSM at the time it was authorized, ratified and approved.

California Corporations Code, § 310(a) states:

> (a) No contract or other transaction between a corporation and one or more of its directors, or between a corporation and any corporation, firm or association in which one or more of its directors has a material financial interest, is either void or voidable because such director or directors or such other corporation, firm or association are parties or because such director or directors are present at the meeting of the board or a committee thereof which authorizes, approves or ratifies the contract or transaction, if
>
> (1) The material facts as to the transaction and as to such director's interest are fully disclosed or known to the shareholders and such contract or transaction is approved by the shareholders (Section 153) in good faith, with the shares owned by the interested director or directors not being entitled to vote thereon, or

    > (2) The material facts as to the transaction and as to such director's interest are fully disclosed or known to the board or committee, and the board or committee authorizes, approves or ratifies the contract or transaction in good faith by a vote sufficient without counting the vote of the interested director or directors and the contract or transaction is just and reasonable as to the corporation at the time it is authorized, approved or ratified, or
>
> (3) As to contracts or transactions not approved as provided in paragraph (1) or (2) of this subdivision, the person asserting the validity of the contract or transaction sustains the burden of proving that the contract or transaction was just and reasonable as to the corporation at the time it was authorized, approved or ratified.

California Corporations Code, § 310(a).

Thus, under California Corporations Code § 310, a plaintiff may seek redress for a loss caused by an interested director participating in a transaction between a corporation and the director. *Walczak v. EPL Prolong, Inc.*, 198 F.3d 725, 732-733 and n. 4 (9th Cir. 1999). California Corporations Code, § 310 provides that a contract or transaction between a corporation and one or more of its directors is not necessarily invalid and that "even if the director's personal interest was not disclosed and the transaction was not approved or ratified by a majority of the disinterested board members or shareholders, the transaction can still be valid." *Id.* at 732. That is, "a court can uphold the Interested Director Transaction if the party asserting the validity of the . . . transaction sustains the burden of proving that the contract or transaction was just and reasonable as to the corporation at the time it was authorized, approved or ratified." *Id., citing*, California Corporations Code § 310(a)(3) (footnote and internal quotation marks omitted).

Under Section 310, where approval of a transaction was not approved by a disinterested board of directors, the party seeking to uphold the transaction has burden to prove, under Section 310(a)(3), that the transaction was just and reasonable to the corporation. *Sammis v. Stafford*, 48 Cal.App.4th 1935, 1943 (1996) (citation omitted). If a self-interested transaction violates Section 310, the contract is voidable, and the plaintiff may elect to rescind the contract and seek restitution. *See Remillard Brick Co. v.*

*Remillard-Dandini Co.*, 109 Cal.App.2d 405, 424 (1952).

However, as discussed previously, there is a general rule that corporate directors owe no duty to creditors when a corporation is solvent, and only if the corporation is insolvent, there may be a duty to creditors under the "trust fund" doctrine. *Berg & Berg Enterprises, LLC v. Boyle,* 178 Cal. App. 4th at 1038-1048. Because the court has found that GSM was not insolvent at the time of the Transaction and was not rendered insolvent by the Transaction and that GSM's financial distress was caused by other post-Transaction supervening causes, the court concludes that Trustee lacks standing to assert a claim under California Corporations Code, § 310, against Honarkar and Fernandez de Castro as directors of GSM since Trustee represents the interests of creditors. *Id.*

For the foregoing reasons, the court denies Trustee's claims under California Corporations Code, § 310.

**V. Rescission under Section 315 of California Corporations Code**

California Corporations Code, § 315(a), provides that a corporation shall not make a loan to a director or officer of a company unless that transaction is approved by the majority of shareholders. First, as discussed previously, the court concludes that Trustee as a representative of GSM's creditors lacks standing to assert a claim under California Corporations Code, § 315, against Honarkar and Fernandez de Castro as directors of GSM because there is a general rule that corporate directors owe no direct duty to creditors when a corporation is solvent and because the court has found that GSM was not insolvent at the time of the Transaction and was not rendered insolvent by the Transaction. *Berg & Berg Enterprises, LLC v. Boyle,* 178 Cal. App. 4th at 1038-1048. Second, Trustee's claim under Section 315 fails as a matter of law in this case because Honarkar and Fernandez de Castro, the only two shareholders of GSM, unanimously consented to the Transaction. Therefore, the Transaction was approved by the majority of shareholders for purposes of Section 315. As such, Trustee's claims for rescission under California Corporations Code, § 315, should be denied.

**VI. Breaches of Fiduciary Duty to GSM**

Trustee has alleged three claims against Honarkar and Fernandez de Castro stating that they breached their fiduciary duties as directors to GSM in the Transaction. Trustee alleges claims for breach of fiduciary duty pursuant to California Corporations Code, §§ 309 and 316, breach of common law fiduciary duty of a director, and aiding and abetting a breach of fiduciary duty.

California law mandates that a director shall perform his duties as a director "in good faith, in a manner such director believes to be in the best interest of the corporation and its shareholders and with such care, including reasonable injury, as an ordinarily prudent person in a like position would use under similar circumstances." California Corporations Code, § 309(a). Section 309 codifies California's "Business Judgment Rule," which "refers to a judicial policy of deference to the business judgment of corporate directors in the exercise of their broad discretion in making corporate decisions." *Gaillard v. Natomas Co*., 208 Cal.App.3d 1250, 1263-1264 (1989). "Directors owe a duty of highest good faith to the corporation and its stockholders." *Remillard Brick Co. v. Remillard-Dandini Co.*, 109 Cal.App.2d at 424. It is a violation of these duties "for officers, or directors, or majority shareholders to give away or appropriate to themselves any corporate assets." *Burt v. Irvine Co.,* 237 Cal.App.2d 828, 850 (1965).

Section 316 further provides that directors of a corporation will be jointly and severally liable to the corporation on behalf of its nonconsenting creditors if (1) they make an improper distribution to shareholders; (2) they distribute assets to shareholders after dissolution proceedings have begun, and (3) if they make a loan or guaranty contrary to § 315. California Corporations Code, § 316. However, liability under California Corporations Code, § 316 is subject to the Business Judgment Rule codified in Section 309, and a director cannot be held personally liable where he has acted in accordance with the business judgment rule. *Berg & Berg Enterprises, LLC v. Boyle,* 178 Cal.App.4th 1020, 1045 (2009).

The elements of a claim for breach of fiduciary duty are: (1) the existence of a

fiduciary relationship; (2) the breach of that relationship; and (3) damages proximately caused by the breach. *Pierce v. Lyman*, 1 Cal.App.4th 1093, 1101 (1991). Remedies for a breach of fiduciary duty include damages for all harm proximately caused to the corporation, as well as rescission and restitution. *Hicks v. Clayton*, 67 Cal.App.3d 251, 264 (1977)(citations omitted).

Trustee relies on California Corporations Code, § 309 to claim that Honarkar and Fernandez de Castro owed fiduciary duties as officers and directors of the corporation, GSM, to act in good faith and in a manner that was in the best interests of the corporation and its shareholders. There is no dispute that as CEO and President of GSM, both Honarkar and Fernandez de Castro acted in fiduciary capacities for GSM. Trustee alleges that Honarkar and Fernandez de Castro breached their fiduciary duties to GSM by unlawfully approving and distributing GSM's funds through the Transaction. Trustee contends that Honarkar and Fernandez de Castro by pursuing their own personal interests rather than the best interests of GSM and its creditors, GSM was therefore damaged in the amount of the transfer. However, Trustee as the representative of GSM's creditors in this bankruptcy case must show that he is acting on behalf of creditors whose debts or claims arose before the improper distribution to shareholders and who have not consented to the distribution in order to assert a claim under California Corporations Code, § 316. California Corporations Code, §§ 316, 506(b); 2 Clark (ed.), *Ballantine & Sterling California Corporation Laws,* § 146.01 at 8-75 – 8-76 (4th ed. 2011). As discussed previously, Trustee has not offered sufficient evidence to establish that there were such creditors of the estate whose claims arose before the allegedly improper distribution. Without such a showing, Trustee lacks standing to assert a claim under California Corporations Code, § 316.

Assuming *arguendo* that Trustee has standing to assert a claim under California Corporations Code, § 316, the court concludes that as the only two shareholders of GSM, Honarkar and Fernandez de Castro, were free to dispose of GSM's assets however they chose, so long as the corporation was not insolvent or rendered insolvent.

*See Miller & Lux, Inc. v. Anderson*, 318 F.2d 831, 838 (9th Cir. 1963) (holding that when a "corporation is hurt, or destroyed, by the intended conduct of the owners of its shares, [it] gives rise to no legal claims, either in the shareholders, or in the corporation as a legal entity"); *Berg & Berg Enterprises, LLC v. Boyle,* 178 Cal.App.4th at 1038-1048. Therefore, if the shareholders unanimously consent to an action, even if the action is detrimental to the company, the action does not provide legal recourse to the corporation as a separate legal entity. *Id.* Honarkar and Fernandez de Castro owned one hundred percent of GSM stock and because they each approved the transaction, it was impossible for either Honarkar or Fernandez de Castro to breach their fiduciary duties to GSM's shareholders. *Id.* Defendants, therefore, did not violate any fiduciary duties that they owed to GSM at the time of the Transaction since GSM was not insolvent at the time of the Transaction or rendered insolvent by the Transaction. *Id.; cf., In re Bay Plastics, Inc.,* 187 B.R. at 330-331 (a leveraged buyout transaction which renders a debtor insolvent may be considered a fraudulent transfer).

Furthermore, California Corporations Code § 309 provides an escape clause that shields Fernandez de Castro and Honarkar from any liability while acting in their fiduciary capacity toward GSM. Section 309 states in pertinent part:

> (b) In performing the duties of a director, a director shall be entitled to rely on information, opinions, reports or statements, including financial statements and other financial data, in each case prepared or presented by any of the following:
>
> > (1) One or more officers or employees of the corporation whom the director believes to be reliable and competent in the matters presented.
> >
> > (2) Counsel, independent accountants or other persons as to matters which the director believes to be within such person's professional or expert competence . . .
>
> so long as, in any such case, the director acts in good faith, after reasonable inquiry when the need therefor is indicated by the circumstances and without knowledge that would cause such reliance to be unwarranted.
>
> (c) A person who performs the duties of a director in accordance with subdivisions (a) and (b) shall have no liability based upon any alleged failure to discharge the person's obligations as a director.

California Corporations Code, § 309(b) and (c).

Defendants brought additional parties into the transaction's negotiation process, including GSM's outside independent accountant, Tony Chang, their personal counsel, and counsel for GSM and Cingular. The court finds that the defendants were not unwarranted in their actions. GSM was not insolvent at the time of the Transaction, and thus Honarkar and Fernandez de Castro were entitled to do as they saw fit with the company, and under the business judgment rule, cannot be held liable for their alleged failures as directors or shareholders. In fact, both Honarkar and Fernandez de Castro exercised reasonable inquiry and due care as directors by including independent parties and financial and legal advisors to negotiate and oversee the Transaction. By consulting with their accountant who recommended an appropriate course and strategy for GSM to effectively buy out Fernandez de Castro in the transaction, Honarkar and Fernandez de Castro were entitled to rely on the independent accountant Chang's opinions and statements in performing their duties as directors. The evidence indicates that both directors of GSM acted in good faith and relied on information they believed to be reliable and competent; their reliance was not unwarranted under the circumstances, and they have no liability based upon their alleged failures as directors and officers of GSM.

Some courts have posited, however, that individual directors of financially distressed corporations owe these fiduciary duties to *creditors* as opposed to shareholders once the corporation operates in the "zone of insolvency" or upon insolvency. *See, e.g*., *Credit Lyonnais Bank Nederland N.V. v. Pathe Communications Corp*., 1991 WL 277613 at *34 & n. 55 (Del. Ch. Ct., unpublished opinion filed on December 30, 1991) ("At least where a corporation is operating in the vicinity of insolvency, a board of directors is not merely the agent of the residue risk bearers [i.e., shareholders], but owes its duty to the corporate enterprise. . . . [Directors should] recognize that in managing the business affairs of a solvent corporation in the vicinity of insolvency, circumstances may arise when the right (both the efficient and the fair)

course to follow for the corporation may diverge from the choice that the stockholders (or the creditors, or the employees, or any single group interested in the corporation) would make if given the opportunity to act.").

Subsequent federal and state courts considering this issue emphasize the requisite of insolvency before directors owe a duty to creditors. Indeed, in *Berg & Berg Enterprises, LLC v. Boyle*, a California Court of Appeals explained, "As long as the corporation is solvent, no matter how badly managed it might be, it is able to satisfy its contractual obligations to creditors who are therefore unaffected by management's business decisions." 178 Cal.App.4th at 1039. However, once insolvency arises, "the value of creditors' contract claims may be affected by management's business decisions in a way it was not before insolvency. . . . Because insolvency shifts the residual risk of management decisions from shareholders to creditors, at least some of the duties formerly owed by directors only to shareholders are owed also to creditors upon that circumstance. . . ." *Id.*, *citing*, *In re Ben Franklin Retail Stores, Inc*., 225 B.R. 646, 652-656 (Bankr. N.D. Ill. 1998).

The court in *Berg & Berg Enterprises* explained the general rule of no fiduciary duty owed by corporate directors to creditors as follows:

> As generally discussed by the court in *Ben Franklin,* the rationale for the general rule of no duty owed to creditors is that it is the shareholders who own a corporation, which is managed by the directors. In an economic sense, when a corporation is solvent, it is the shareholders who are the residual claimants of the corporation's assets and who are the residual risk-bearers. As long as the corporation remains solvent, the business decisions made by management directly affect the shareholders' income; management accordingly owes fiduciary duties to those shareholders as well as to the corporation. The corporation's creditors, on the other hand, are free to protect their interests by contract. As long as the corporation is solvent, no matter how badly managed it might be, it is able to satisfy its contractual obligations to creditors who are therefore unaffected by management's business decisions. But when insolvency arises, the value of creditors' contract claims may be affected by management's business decisions in a way it was not before insolvency. At the same time, as long as insolvency persists, shareholder value is essentially worthless and shareholders no longer occupy the position of residual claimants. Because insolvency shifts the residual risk of management decisions from shareholders to creditors, at least some of the duties formerly owed by directors only to shareholders are owed also to

creditors upon that circumstance, or so the theory goes.

178 Cal.App.4th at 1039 (footnote omitted), *citing, In re Ben Franklin Retail Stores, Inc*., 225 B.R. at 652-656 and *In re Verestar, Inc.*, 343 B.R. 444, 471-472 (Bankr. S.D.N.Y. 2006).

The *Berg & Berg Enterprises* court also discussed California's "trust fund doctrine," which states that, upon a corporation become insolvent, all corporate assets "become a trust fund for the benefit of all creditors." *Id.* at 1040, *citing*, *Pepper v. Litton*, 308 U.S. 295, 306-307 (1939) and its progeny. The court went on to hold that, under California law, there is no fiduciary duty owed to creditors by corporate directors solely by virtue of the fact that the corporation is operating in the "zone" of insolvency. *Berg & Berg Enterprises, LLC v. Boyle*, 178 Cal.App.4th at 1041. Additionally, the court held that to the extent an *already insolvent corporation* owes fiduciary duties to creditors, those duties do not arise absent "trust fund doctrine" circumstances, i.e., limited "*to the avoidance of actions that divert, dissipate, or unduly risk corporate assets that might otherwise be used to pay creditors claims*." *Id.* (emphasis in original); *see also, In re Moeller,* 466 B.R. at 533-534.

As discussed previously, GSM was not insolvent at the time of the Transaction in 2003. Thus, Honarkar and Fernandez de Castro, as the "residual risk takers" in their status as shareholders were entitled to use GSM as they willed as long as it was solvent. The corporate fiduciary duties did not shift from being owed to the entity over to creditors because the Trustee's evidence, including the testimony of his expert, Schafer, did not establish insolvency under any of the appropriate tests set forth in CUFTA. As such, under California law, Honarkar and Fernandez de Castro, as corporate directors or principals of a solvent GSM, did not owe fiduciary duties to GSM's creditors. *Berg & Berg Enterprises, LLC v. Boyle*, 178 Cal.App.4th at 1038-1041; *In re Moeller,* 466 B.R. at 533-534.

As directors of GSM, the decision made by Honarkar and Fernandez de Castro to complete the Transaction is protected by the business judgment rule with respect to their

duties owed to the corporation itself. Additionally, Trustee has not shown that GSM was not insolvent at the time of the Transaction or that it was rendered insolvent by the Transaction, and thus Honarkar and Fernandez de Castro did not owe any fiduciary duties to the creditors of GSM. Therefore, the court finds for defendants and against Trustee for the claims under California Corporation Code, §§ 309 and 316 and the common law for breach of fiduciary duty and for aiding and abetting breach of fiduciary duty.

**VII. Breach of Loyalty**

In addition to claims of breach of their fiduciary duties to GSM, Trustee alleges claims that defendants have breached their duty of loyalty to GSM. California courts have defined the elements of these claims as analogous to a claim for breach of fiduciary duty. *Huong Que, Inc. v. Luu*, 150 Cal.App.4th 400, 410 (2007); *In re Brocade Communication Systems, Inc. Derivative Litigation*, 615 F. Supp. 2d 1018, 1036-1037 (N.D. Cal. 2009) ("claims for breach of an employee's duty of loyalty and aiding and abetting a breach of fiduciary duty are most akin to a breach of fiduciary duty claim"). To succeed on a claim for breach of the duty of loyalty, Trustee must prove that (1) the existence of a relationship giving rise to a duty of loyalty; (2) one or more breaches of that duty; and (3) damage proximately caused by that breach. *Huong Que, Inc. v. Luu*, 150 Cal.App.4th at 410.

In the Amended Complaints, Trustee alleges that as directors and executive officers of GSM, Honarkar and Fernandez de Castro took $3 million in funds belonging to GSM as part of a personal transaction as directors and shareholders of the corporation, which undermined the ability of GSM to manage its assets and receive adequate consideration for them. Trustee claims that the Defendants, while acting as directors of GSM, must give preference to the interests of the company and not act for their own benefit to the detriment of the company. The court concludes that Trustee's claims for breach of loyalty also fails for the same reasons as the claims for breach of fiduciary duty because unless GSM was insolvent, the directors and officers owed no direct duties to

the creditors. *See, Berg & Berg Enterprises, LLC v. Boyle*, 178 Cal.App.4th at 1038-1041.

**VIII. Unjust Enrichment**

Trustee asserts common law claims of unjust enrichment against defendants. When a defendant receives a benefit in circumstances such that it would be unwarranted to retain that benefit at the expense of another, the defendant is said to be unjustly enriched. *Hirsch v. Bank of America*, 107 Cal.App.4th 708, 717 (2003)(citation omitted). Under California law, the elements of unjust enrichment are: (1) the receipt of a benefit; and (2) the unjust retention of the benefit at the expense of another. *Peterson v. Cellco Partnership*, 164 Cal.App.4th 1583, 1593 (2008)(citation omitted). The term “benefit” refers to any type of advantage, and includes “not only when one adds to the property of another, but also when one saves the other from expense or loss.” *Ghirardo v. Antonioli*, 14 Cal.4th 39, 51 (1996). When a party has received a benefit from another, it is required to make restitution only if the circumstances of its receipt or retention are such that, as between the two parties, the retention of the benefit is unjust. *Id.; see also, California Medical Association, Inc. v. Aetna U.S. Healthcare of California*, Inc., 94 Cal.App.4th 151, 171 n. 23 (2001)(citations omitted). As a matter of law, a quasi-contract action for unjust enrichment does not lie where an express binding agreement exists and defines the parties' rights. *California Medical Association, Inc. v. Aetna U.S. Healthcare of California, Inc.*, 94 Cal.App.4th at 172 (citations omitted).

There is no dispute that defendants benefitted from the Transaction, i.e., Fernandez de Castro obtained $3 million dollars in cash from GSM’s residuals, and Honarkar obtained full control of GSM from the transaction in buying out Fernandez de Castro. However, as discussed above, here, the parties to the Transaction, Fernandez de Castro, Honarkar and GSM entered into binding contractual agreements for the purchase by Honarker and sale by Fernandez de Castro of Fernandez de Castro’s stock in GSM to Honarkar and the loan by GSM to Honarkar for the purchase and sale of Fernandez de Castro’s GSM stock as well as other agreements with third party Cingular Wireless to permit the Transaction. Thus, under *California Medical Association,* since

there are binding contractual agreements here, a quasi-contractual claims for unjust enrichment does not lie. 94 Cal.App.4th at 172 (citations omitted). The transactional documents laid out the terms of the Transaction and Honarkar as the 100% shareholder of GSM had the right to dispose of its assets as long as it was not insolvent at the time of the Transaction and was not rendered insolvent by the Transaction, which did not appear to be the case at the time of the Transaction. As discussed above, subsequent supervening events not contemplated at the time of the Transaction show that the making of the payments under the Transaction would later have an adverse effect on GSM's financial condition.

As to Fernandez de Castro, the court concludes that the unjust enrichment claim should also be denied because he gave up reasonably equivalent value, his stock in GSM, for the benefit conferred on him in the Transaction, so the court cannot say that he was "unjustly" enriched.

For the foregoing reasons, the court concludes that Trustee has not proven his claims for unjust enrichment.

**IX. Conversion**

Trustee asserts common law claims of conversion against defendants. Conversion is the wrongful exercise of dominion or control over the personal property of another. *Farmers Insurance Exchange v. Zerin*, 53 Cal.App.4th 445, 451 (1997). The elements of conversion are: (1) the plaintiff's ownership or right to possession of the property at the time of the conversion; (2) the defendant's conversion by a wrongful act or disposition of property rights; and (3) damages. *Id.* If the plaintiff cannot show that the exercise of control over the money at issue was wrongful, the cause of action must be dismissed. *Otworth v. Southern Pacific Transportation Co.*, 166 Cal.App.3d 452, 458 (1985)(citations omitted). Conversion is a strict liability tort that "consists in the breach of an absolute duty," and so "questions of the defendant's good faith, lack of knowledge, and motive are ordinarily immaterial." *Mendoza v. Rast Produce Co., Inc.*, 140 Cal.App.4th 1395, 1405 (2006).

It is undisputed that GSM had a contractual right to possession of the $3 million purchase price from the residuals paid by Cingular to it. For a conversion action to lie, "[n]either legal title nor absolute ownership of the property is necessary," and "[a] party need only allege that it is entitled to immediate possession at the time of conversion." *Farmers Insurance Exchange v. Zerin*, 53 Cal.App.4th at 451. However, "a mere contractual right of payment, without more, will not suffice." *Id.* As GSM did not have an immediate right to possession of the residuals, but only a contractual right, GSM cannot meet the first element required for a conversion claim.

Additionally, defendants are not liable for conversion to GSM because Honarkar and Fernandez de Castro were the 100% shareholders and they were free to dispose of GSM's assets at their discretion if GSM was solvent at the time of the Transaction and not rendered insolvent by the Transaction without "the duty to avoid diversion, dissipation, or undue risk to assets that might be used to satisfy creditors." *Berg & Berg Enterprises, LLC v. Boyle,* 178 Cal.App.4th at 1046-1047. Because the shareholders unanimously consented to the disposition of GSM's assets, the action does not give rise to legal claims in the corporation as a separate legal entity. *Id.*

Furthermore, Honarkar never exercised control over the funds at issue as Trustee alleges. He never possessed the funds because Fernandez de Castro received the monthly payments directly from Cingular, GSM participated and agreed to the Transaction, and GSM was not damaged because it was not insolvent at the time of the Transaction and was not rendered insolvent by the Transaction, and at the time, Honarkar, as the 100% shareholder of GSM in the Transaction was free to dispose of its assets. These facts illustrate that the Honarkar did not wrongfully convert the funds to his own use and enjoyment at the time of the Transaction.

The funds went to Fernandez de Castro, but there was no conversion because he did not obtain the funds by a wrongful act, but through a bargained-for exchange in which he gave up his equity interest in GSM to Honarkar for fair consideration.

Thus, the court concludes that Trustee's claims for conversion should be denied.

**X. Common Count**

Trustee's claims for "Common Count – Claim for Money" are similar to the causes of action for conversion and unjust enrichment and should also be denied. The essential allegations of a common count are: "(1) the statement of indebtedness in a certain sum, (2) the consideration, i.e., goods sold, work done, etc., and (3) nonpayment." *Farmers Insurance Exchange v. Zerin*, 53 Cal.App.4th at 460 (citation omitted). A cause of action for money had and received is stated if it is alleged the defendant "is indebted to the plaintiff in a certain sum for money had and received by the defendant for the use of the plaintiff." *Id.* (internal citations omitted). "A common count is proper whenever the plaintiff claims a sum of money due . . . as an indebtedness in a sum certain." *Utility Audit Co. v. City of Los Angeles*, 112 Cal.App.4th 950, 958 (2003)(citation omitted).

It is undisputed that Honarkar signed a promissory note obligating himself to pay GSM $3 million. The $3 million is a sum certain. It is also undisputed that the $3 million was consideration for the note payable to GSM. Thus, GSM has established the first and second elements of a common count. However, the third element of non-payment depends on the resolution of GSM's other claims. Under the terms of the promissory note, Honarkar was not obligated to pay the debt due unless and until GSM issued dividends on his common stock. Because GSM has yet to issue any dividends triggering the requirement that Honarkar repay the $3 million loan, under the terms of the promissory note, it might be argued that a common count claim may not be ripe as to Honarkar. Because it is not now likely that GSM would ever pay a dividend, this would probably mean that the debt would never be payable under Honarkar's position despite his getting the benefit of GSM's payment of residual income from Cingular to pay off his acquisition of Fernandez de Castro's one-half interest in GSM. This may not be an appropriate result because Honarkar was on both sides of the transaction as the borrower and the 100-percent owner of the lender, signing the note with the condition very favorable to him personally, which limited his obligation to repay the loan to any dividends from GSM, that is, only if GSM turned out to be profitable in the future would he

have to repay the obligation. *Trial Exhibit 31, Promissory Note.*

Part of the consideration that Honarkar provided for the Transaction was his agreement to repay GSM for the moneys it advanced to pay off his acquisition of Fernandez de Castro's ownership interest in GSM, so Honarkar's argument that Trustee's common count claim should be denied because it received valuable consideration is a *non sequitur.*

Trustee does not have a valid common count claim against Fernandez de Castro because Fernandez de Castro gave fair consideration to Honarkar and GSM for giving up his equity interests in GSM. Such claim should be denied as against Fernandez de Castro.

With respect to the $900,000 investment made by Honarkar in GSM in May 2005, Honarkar asserts a postpetition claim for the funds as a loan to GSM, and Trustee has objected to allowance of the claim. The post-petition loan made by Honarkar was approved by the court with a reservation of rights by GSM, the unsecured creditors' committee and a Chapter 7 or 11 trustee. *See* 11 U.S.C. § 364. The court is of the view that the $900,000 loan made by Honarkar as an "investment" in the postpetition reorganization of GSM in voluntary Chapter 11 proceedings in this case should be appropriately considered a partial repayment of Honarkar's debt to repay the $3 million loan for the purchase of Fernandez de Castro's one-half interest in GSM. *See Defendant Honarkar's Proposed Findings of Fact and Conclusions of Law,* lodged on May 28, 2010, at 61:9-10 ("If Honarkar would have been found liable for any amounts against GSM, the amount of that liability would have been offset against the $900,000 that is due and own from GSM to Honarkar.").

The court considers that the parties' briefing on the common count claim against Honarkar is insufficient and requests further briefing on the issues of the common count claim, such as the impact of the promissory note language limiting Honarkar's obligation to repay the loan from GSM's dividends when now we know it is unlikely that there will ever be any in light of GSM's financial distress and the possibility of offset against

Honarkar's postpetition loan to GSM. Accordingly, the court orders that Honarkar and Trustee parties file supplemental briefs on the common count claim with 30 days of the entry of this decision and that they may file optional briefs in response to the other party's original supplemental brief within 14 days thereafter.

**XI. Accounting**

An accounting is a form of discovery device whose purpose is to discover the amount of a sum of money owed to the plaintiff. *Teselle v. McLoughlin*, 173 Cal.App.4th 156, 180 (2009)(citation omitted). A cause of action for an accounting requires a showing that a fiduciary relationship exists between the plaintiff and defendant that requires an accounting, and that some balance is due the plaintiff that can only be ascertained by an accounting. *Id.* at 179. Thus, a complaint does not state a cause of action for an accounting where the plaintiff alleges the right to recover a sum certain or a sum that can be made by calculation. *Id.*

Trustee's second amended complaint against Fernandez de Castro indicates that the bankruptcy estate is seeking to recover the $3 million paid to Fernandez de Castro from the Transaction. This amount is a sum certain. Trustee admits as much by pleading a cause of action for common counts, which requires the existence of a sum certain. Thus, the Second Amended Complaint against Fernandez de Castro does not state a proper cause of action for an accounting since the amount claimed is a sum certain and should be denied. The same is true for the first amended complaint against Honarkar since the amount claimed is a sum certain, namely, the $3 million paid to Fernandez de Castro for Honarkar's control of GSM, and thus, the accounting claim against Honarkar should be also denied.

**CONCLUSION**

For the reasons stated above, the court finds that Trustee has failed to prove by a preponderance of the evidence the claims for relief in his amended complaints against defendants, which also includes the claims for declaratory relief and objections to claims dependent on the other claims, except as otherwise discussed herein.

Accordingly, except as for the common count claim against Honarkar, the court concludes that Trustee on behalf of the GSM bankruptcy estate should take nothing by way of the complaints against defendants and the adversary action should be dismissed with prejudice. Because the court holds in favor of defendants on Trustee's claims for rescission, the cross-claims of defendants against each other for equitable indemnification, contribution and declaratory relief are moot and need not be addressed.

The parties are ordered to submit supplemental briefing on Trustee's common count claim against Honarkar as discussed above. Any further hearing is vacated, and after the supplemental briefing is submitted on the common count claim against Honarkar, the court will determine whether any further hearing should be set on that claim.

Defendants are ordered to submit proposed judgments consistent with this memorandum decision within 30 days of entry of this decision.

IT IS SO ORDERED.

###

Date: April 5, 2013

Robert Kwan
United States Bankruptcy Judge

# NOTICE OF ENTERED ORDER AND SERVICE LIST

Notice is given by the court that a judgment or order entitled (*specify*) MEMORANDUM DECISION ON TRUSTEE'S ADVERSARY COMPLAINTS AGAINST DEFENDANTS MOHAMMAD HONARKAR AND JOSEPH FERNANDEZ DE CASTRO AND ON DEFENDANTS' CROSS-CLAIMS FOR INDEMNITY AND CONTRIBUTION as entered on the date indicated as "Entered" on the first page of this judgment or order and will be served in the manner indicated below:

**I. <u>SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING ("NEF")</u>** Pursuant to controlling General Order(s) and Local Bankruptcy Rule(s), the foregoing document was served on the following person(s) by the court via NEF and hyperlink to the judgment or order. As of **April 5, 2013**, the following person(s) are currently on the Electronic Mail Notice List for this bankruptcy case or adversary proceeding to receive NEF transmission at the email address(es) indicated below.

- Vincent M Coscino vcoscino@allenmatkins.com, jaallen@allenmatkins.com
- Anne W Hamann ahamann@piteduncan.com, ecfcacb@piteduncan.com
- Garrick A Hollander ghollander@winthropcouchot.com, pj@winthropcouchot.com;vcorbin@winthropcouchot.com;chipp@winthropcouchot.com
- Weneta M Kosmala (TR) Weneta.Kosmala@7trustee.net, ca15@ecfcbis.com;wkosmala@kosmalalaw.com;dfitzger@kosmalalaw.com;kgeorge@kosmalalaw.com
- Leib M Lerner leib.lerner@alston.com
- Ali M Mojdehi amojdehi@cooley.com, jgertz@cooley.com;bbyun@cooley.com;arego@cooley.com
- Evan D Smiley esmiley@wgllp.com
- John B Taylor taylaw@gte.net
- James A Timko jtimko@allenmatkins.com
- United States Trustee (SA) ustpregion16.sa.ecf@usdoj.gov

**II. <u>SERVED BY THE COURT VIA U.S. MAIL:</u>** A copy of this notice and a true copy of this judgment or order was sent by United States Mail, first class, postage prepaid, to the following person(s) and/or entity(ies) at the address(es) indicated below:

Alexander L Conti
Eagan O'Malley & Avenatti LLP
450 Newport Center Dr 2nd Fl
Newport Beach, CA 92660

Gabriel K Coy
Cadden & Fuller LLP
114 Pacifica, Suite 450
Irvine, CA 92618-3326

Mohammad Honarkar
3141 Michelson Drive, Apt. 801
Irvine, CA 92618

***Debtor***
GSM Wireless Inc
8871 Research Drive
Irvine, CA 92618

Ignacio J Lazo
114 Pacifica Ste 150
Irvine, CA 92618

John C O'Malley
450 Newport Center Dr 2nd Fl
Newport Beach, CA 92660

Lisa A Wegner
Eagan O'Malley & Avenatti LLP
450 Newport Cntr Dr 2nd Fl
Newport Beach, CA 92660

Michael J Wright
3 Hutton Centre Dr 9th Fl
Santa Ana, CA 92707